## Potter Title & Trust Company, Admr., Appellant, *v.* Knox.

Argued March 15, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Harry Alan Sherman,* for appellants.

*Thomas E. Barton,* with him *Paul F. Jones,* for appellees.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, April 18, 1955:

This action seeks to apply the doctrine of respondeat superior to facts which do not warrant the imposition of liability upon the employers for the act of the employe who committed the actionable offense.

The suit is based on an event which occurred more than seven years ago, but, since the docket entries have not been printed in the record, we are not informed as to the cause of this long delay in the progress of the litigation.

On February 17, 1948, and for some time prior thereto, taxicab drivers belonging to the A. F. of L. and employed by the Yellow Cab Company in Pittsburgh were on strike; the drivers of the Owl Taxicab Company, a partnership consisting of the present defendants, belonged to the C.I.O. and were not on strike.

On the day in question, at about 1 o'clock A.M. Joshua Allen, a taxicab driver employed by defendants, was transporting passengers in his cab northwardly on Smithfield Street. When he arrived at the intersection of the Boulevard of the Allies he stopped for a red light. At the southwest corner of the intersection a dozen or more persons were congregated, presumably Yellow Cab drivers. A witness to the occurrence testified that "There was a few things said, such as 'Where did you get that load?'" These remarks came from somebody in the crowd and were addressed to Allen. Another witness testified that ". . . I started hearing these fellows on the corner making different remarks with reference to this Owl driver, where did he obtain this load, you are out of your territory, and different things." A third witness testified merely that "There were remarks made." These witnesses all testified that nobody on the corner left the sidewalk to go into the street or made any movement whatever toward the taxicab. It was stipulated by counsel that six other named witnesses would, if called, have testified similarly to these three.

When the red light changed to yellow Allen started up and as he was crossing the intersection of the Boulevard he opened the window of his cab and fired a revolver toward the men on the corner who were then diagonally to his rear; the shot struck and killed one Louis Edward DiLembo. The administrator of DiLembo's estate brought suit under the Survival Act and his mother brought suit under the Wrongful Death Act to recover damages from Allen's employers, the Owl Taxicab Company. The court below, after hearing plaintiff's testimony, entered a nonsuit which was sustained by the court en banc. Plaintiffs thereupon took the present appeal.

In an attempt to impose liability on his employers for the outrageous act which Allen committed,* plaintiffs rely upon testimony given by a former employe of defendants to the effect that a meeting was had by the management and employes at which the men were encouraged by words and actions of the company's officials to protect themselves against attacks by the strikers. The first question that arose at the trial was in regard to the time when this meeting was held. Coles, the witness referred to, testified, when it was called to his attention that the shooting by Allen occurred on February 17th, that the meeting was held "the day before," that it was held "the day prior to this trouble." However, it appears that two of the company's drivers were arrested on February 17th for carrying revolvers, one at 2:45 P.M. and the other at 5:15 P.M. of that day and therefore *after* the shooting by Allen had taken place, and Coles testified that these arrests were made and word thereof brought to the meeting either while it was still in progress or shortly after it had ended and not all of those present had yet dispersed; he stated unequivocally that, whatever date it may have been, the meeting was on the same day as the one on which these arrests took place, and he thus finally fixed the time in a manner that admitted of no uncertainty. Accordingly the trial judge, having originally admitted all the testimony as to what occurred at the meeting, properly granted defendants' motion to strike it from the record as being irrelevant, which it obviously was.

Let us assume, however, arguendo, that the meeting did precede the event of the shooting. What was said and done there? Coles testified that "They [the drivers] were ordered to protect themselves and de-

---

* Allen was indicted and convicted of the crime of manslaughter and sentenced to a term of four to eight years in the workhouse.

fend themselves if necessary, and we wouldn't have to worry about being left to rot in jail." And again: "We weren't demanded to work but all those that cared to work were permitted to work and would be protected by the company in case there was any trouble." And again: "Then if you get in trouble protecting yourself the company will go broke behind you." Nothing was said about the drivers carrying revolvers, nor is there any evidence that the officials of the company knew that any of the employes did carry revolvers, and Coles admitted that he did not see any gun at the meeting. He did say that 24 pieces of pipe were there for distribution to any of the 50 employes present who wanted one, but when the company's attorney later entered the meeting he advised that the pipes should all be returned, and when Coles last saw them they were piled up in the garage. It is obvious that, so far from there being anything wrong in the company encouraging the employes to protect themselves against attack, the law itself gave them that right just as it gives the right of self-defense to everyone. Nor could there be any just criticism of the company's assurance that it would stand back of its employes in their exercise of such right and would go bail for them if occasion demanded. The important fact to be noted is that there was not the slightest suggestion on the part of the company's officials that the employes should become aggressors, but only that they should protect themselves if necessary. As to the evidence concerning an alleged distribution of pipes which were afterwards returned, such implements were suitable, at best, for defense in case of a close bodily attack and were a far cry from the possession and reckless use of a revolver. In short, even if the meeting did precede the shooting by Allen, and even if Allen had been present at the meeting, as to which there is no evidence what-

ever, no language or conduct there of the company's officials could, by any stretch of the imagination, be held to have authorized Allen or any of the other drivers deliberately to shoot unoffending persons when there was not the slightest justification for such action.

It is a general rule of law that when an act is done in the course of one's employment the employer will not ordinarily be excused from liability although the employe abused his authority and thereby inflicted injury upon another: *Brennan v. Merchant and Co., Inc.*, 205 Pa. 258, 261, 54 A. 891, 892; *Pilipovich v. Pittsburgh Coal Company*, 314 Pa. 585, 589, 590, 172 A. 136, 137, 138; *Orr v. William J. Burns International Detective Agency*, 337 Pa. 587, 590, 591, 12 A. 2d 25, 26, 27. But there is an important exception to that general principle. In Restatement, Agency, §229, comment b, it is said that "Although an act is a means of accomplishing an authorized result, it may be done in so outrageous or whimsical a manner that it is not within the scope of employment." In §231, comment a, it is said: ". . . a gardener using a small stick in an assault upon a trespassing child to exclude him from the premises may be found to be acting within the scope of the employment; if, however, the gardener were to shoot the child for the same purpose, it would be very difficult to find the act within the scope of employment." In §235, comment c, under the heading of "Outrageous acts", it is said that "The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business . . . . In such cases, the facts may indicate that the servant is merely using the opportunity afforded by the circumstances to do the harm. Hence, unless the principal has violated a personal duty to the person injured, or unless he becomes liable because of the nature of the

instrumentality entrusted to the servant . . ., he is not liable for such acts."

In *Howard v. Zaney Bar*, 369 Pa. 155, 85 A. 2d 401, the facts presented a much stronger case for the plaintiff than those in the present action. There a bartender shot a customer who was annoying a female patron; nevertheless it was held that in so doing he was not acting within the scope of his employment even though it was the duty of the owner of the bar to keep it reasonably well policed and even though, when the proprietor hired the bartender, he instructed him to maintain order in the bar. The court said (pp. 156, 157) per Mr. Justice ALLEN M. STEARNE: "It was the duty of the bartender to maintain order. To perform this duty, inherently the bartender was authorized to use all *reasonable* means to maintain an orderly establishment. In keeping and maintaining order he was no doubt furthering the business of his employer. And in using any reasonable means to secure order he was acting within the scope of and in the course of his employment. . . . However, when the bartender . . . pulled out a gun and shot plaintiff, the bartender then departed from the scope of his employment. Such a use of violence under these circumstances is shocking and a gross abuse of all authority the bartender possessed to maintain order. . . . The disorder, if any, was so insignificant and the use of violent force so excessive and dangerous, totally without responsibility or reason, that we are compelled *as matter of law* to absolve defendant of vicarious liability."

In the present case there was obviously no need for Allen, the taxicab driver, to protect himself. The testimony indicates that none of the strikers possessed or used firearms. Nine witnesses (three of whom actually testified and six others who, it was stipulated, would testify similarly) agreed that all that occurred

was that certain remarks—incidentally none of a particularly offensive nature—were directed to Allen, and not one of the men on the corner made a move to leave the sidewalk, to approach Allen in his taxicab, or to molest him in any manner. Moreover he was already on his way when he fired at the group behind him—a criminal act for which he was properly indicted and convicted.** It was an act wholly unauthorized by his employers,—the kind of an act which the law, in one of its rare drolleries, terms a "frolic" of his own.

Plaintiffs contend that defendants *ratified* the shooting because the company's attorney represented Allen in the criminal action against him as well as the two other employes of the company who had been arrested, and also because the company re-employed Allen after he had been released from prison. That these facts did not constitute a ratification of the crime which Allen committed is so obvious that the argument does not merit serious consideration.

Judgment affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On February 17, 1948, Louis DiLembo, while standing at the corner of Smithfield Street and the Boulevard of the Allies in Pittsburgh, was shot and killed by Joshua Allen, a driver of the Owl Taxicab Company which was involved at the time in a labor difficulty. At the trial of the suit which the administrator of the estate of DiLembo brought against the Owl Taxicab Company, Everett O. Coles, president of the union local engaged in the labor controversy, testified that on the day prior to the shooting, Silas Knox, official of the taxicab company, urged the employes to commit acts

---

** His conviction necessarily involved a finding that he had not acted justifiably in self-defense.

of public disorder. It was the contention of the plaintiff that it was because of this exhortation to violence that Joshua Allen, the taxi driver, used the revolver which brought about the untimely demise of DiLembo, who was simply an innocent bystander and in no way concerned with the labor dispute.

The defendant company and its officials contended that the meeting described by Coles occurred *after* the shooting of DiLembo and therefore could in no way be connected with the actions of Allen. In the cross-examination of Coles on this matter, he was asked by defendants' counsel if the meeting did not occur on the same day that two other employes, Pillette and McWilliams, had been arrested for carrying firearms. The Majority, in affirming the judgment of nonsuit in the Court below, assumes that Coles "stated unequivocally that, whatever day it may have been, the meeting was on the same day as the one on which these arrests took place, and he thus finally fixed the time in a manner that admitted of no uncertainty." A meticulous reading of the record will show, however, that the witness's statements with regard to the meeting date coinciding with the arrest of the two revolver-carrying employes were not as unequivocal as the Majority indicates. In the cross-examination of Coles the following occurred: "Q. If the day of the arrests of Pillette and McWilliams was officially shown to you, you would agree that was the day it happened, would you? A. *I don't understand you.* Q. If the record of the arrests of Pillette and McWilliams were shown to you, you would agree that is the day it happened, would you, the official records? A. I know of getting a report that they had been arrested. Somebody was sent to bring them back and they did come back to the garage on the same day."*

---

* All italics, mine.

Prior to this exchange, the witness had testified repeatedly that the meeting had occurred prior to the day that Louis DiLembo was shot. Thus: "Q. . . . *Prior to the shooting* which resulted in the death of Louis DiLembo had you had any meeting with management at which workers attended concerning the general situation? A. We didn't have a Union meeting. The Company called a meeting of its employees on their premises. Q. Did you attend? A. I attended. . . . Q. With reference to that date, the question is about when was this meeting? The date was February 17th. Approximately *how long before* that was this management meeting? A. *The day before.* . . . Q. Mr. Coles, what time on *February 16th* was this meeting, what time of the day? A. It was near noon. . . . Q. Was it on February 16th? A. It could have been the 16th. It could have been the 17th. It could have been the 19th. *It was the day prior to this trouble.* That is all I know . . ."

So far as the date of the meeting was concerned, the vital question was whether it occurred prior to February 17th, the date DiLembo was shot. It was *not* whether it occurred on the day Pillette and McWilliams were arrested. The matter of the date of the arrests of these two men only went to the reliability of Coles' recollection as to the date of the meeting. Evidence that Pillette and McWilliams (who were in no way involved in the DiLembo shooting) were arrested on February 17th does not conclusively establish that the management-employe meeting occurred on the same day. There were other possibilities which would have made the date of the February 17th arrests reconcilable with the proposition that the vital management-employe meeting occurred the day before Allen shot DiLembo. It cannot be arbitrarily excluded that Pillette and McWilliams had been arrested on another or other occasions prior to the date of the shooting, aside

from the February 17th arrests. The Majority makes the Pillette-McWilliams arrests the crucial test of the plaintiff's case, whereas it is at best only a subsidiary and evidentiary item in the trial. In any event, the whole question was one of credibility for the jury.

When a reviewing tribunal is considering the lifting of a compulsory nonsuit, the testimony must be regarded in the light most favorable to the plaintiff. Where there are contradictions in the testimony presented by and on behalf of the plaintiff, it is for the jury to reconcile the contradictions if possible, so long as an eventual reconciliation makes out a prima facie case of liability. This proposition is so fundamental and has been affirmed so habitually that to quote precedent for it is like citing authority for the law of gravitation or for the regularity of the solar system. And yet I have seen this rule of interpretation ignored so many times in recent decisions that perhaps we will have to revert to quoting Sir Isaac Newton and Nicholas Copernicus in support of the monumental truths they so signally established.

The Majority then postulates that even if the meeting did occur prior to the date of the shooting, there was nothing said or done by the officials of the Owl Taxicab Company which would warrant the imposition of liability upon them for the tortious act of their employe Joshua Allen. The Majority says: "The important fact to be noted is that there was not the slightest suggestion on the part of the company's officials that the employes should become aggressors, but only that they should protect themselves if necessary." It seems to me that it would require a de-magnifying glass of considerable power to take the aggression out of the words of Silas Knox (president of the defendant firm) who said: *"Men, this is what we have been waiting for. This is a show-down."* When one speaks of a show-

down, he doesn't mean a withdrawal to a neutral corner; he doesn't mean a retreat. Knox's words were a direct appeal to aggression. If there could be any doubt about their meaning, given the truculent spirit of the whole occasion, Knox underscored the meaning by passing around 24 pieces of 2 ft. pipe. This pipe was certainly not distributed for plumbing purposes. The passing around of these potential lethal weapons, together with the utterance that the day for a "showdown" had arrived, spelled out incitement to violence as clearly as if Knox had read to his employes a declaration of war.

The Majority minimizes the importance of this ominous and menacing situation by saying that the distribution of the pipes was a "far cry from the possession and reckless use of a revolver." But how far is it from a lead pipe to a lead bullet? Once the train of violence is begun, one event leads to another with the fluency, rapidity and explosiveness of Chinese firecrackers.

The arming of the employes with improvised deadly weapons, added to Knox's inflammatory words, ignited a fuse which finally touched off the fatal blast of violence which occurred in the early morning of February 17th. It is to be noted here, in connection with the management's attitude toward violence, that it put up bond for the two employes who were arrested for carrying revolvers.

As I view this case, the courts have a duty to reprehend those who would take the law into their own hands, and the courts should give sanction to all processes which would punish such malfeasors in the place most sensitively felt by persons of that stripe, namely, in their pocket books. It is to me incomprehensible how this Court can immunize from monetary damages a person who sets in motion the forces of disorder which

defy law, social discipline and the courts themselves. The man who sows the wind should pay for the damage wrought by the resulting whirlwind.

Although Chief Justice MAXEY was writing in a felonious homicide case, he stated a salutary rule of law when he said: "A knave who feloniously and maliciously starts 'a chain reaction' of acts dangerous to human life must be held responsible for the natural fatal results of such acts."*

There are certain cases which come before an appellate court which call for more than a mechanical application of stereotyped formulae. Where the welfare of society is involved, various avenues of legal-social significance must be explored before a decision is reached. The great jurist, Judge CARDOZO, writing in "The Nature of the Judicial Process," said: "when they [judges] are called upon to say how far existing rules are to be extended or restricted, they must let the welfare of society fix the path, its direction and its distance . . . . The final cause of law is the welfare of society . . . Justice and general utility, such will be the two objectives that will direct our course."** The other equally celebrated titan of the law, Justice OLIVER WENDELL HOLMES, said: "I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage."***

Applying those sage observations to the case before us, every principle of law (which, after all, is aimed at but one object, the preservation and improvement of human society) urges the reprobation of any conduct that counsels rebellion against constituted society and reversion to primitive violence.

---

* *Commonwealth v. Almeida*, 362 Pa. 596, 634.
** *Commonwealth v. Almeida*, 362 Pa. 596, 629.
*** Ibid, p. 629.

When Joshua Allen whipped out a revolver and shot down Louis DiLembo whom he did not know and with whom he had had no quarrel, he was not acting on a venture of his own. He was acting in the course of his employment as he understood his employment through the words of his superior, Silas Knox. He was carrying out the "get tough" policy of those who were paying him his wages. He was acting within the general scope of his authority, and, under our precedents, the master is responsible. This Court in 1903, speaking through Mr. Justice MESTREZAT, in the case of *Brennan v. Merchant,* 205 Pa. 258, 261, said: "A master is liable for the tortious acts of his servant done in the course of his employment and within the general scope of his authority."

Although the Majority mentions the case of *Orr v. Burns International Detective Agency,* 337 Pa. 587, it does so only to drop it. The Opinion in that case was written by the writer of the present Majority Opinion and I find in that case enough points of similarity with the one at bar to respect it for authority even though it may have been disowned by its author. That case arose out of the seamen's strike in 1936 along the Delaware River waterfront in Philadelphia, when an employe of the Burns Detective Agency, one Smith, shot the plaintiff who was a striker doing picket duty. The detective agency appealed from the verdict of the jury for the plaintiff in the Court below. In refusing judgment n.o.v., this Court said: "It may be that Smith was overzealous in the performance of the duties for which he was employed, that he abused his authority; was reckless, and inflicted unnecessary injury, but all that would not relieve defendant from liability because, as was said by President Judge RICE in Greb v. Pennsylvania R. R. Co. (No. 1), 41 Pa. Superior Ct. 66, 'Not every deviation of the servant from the strict execu-

tion of his duty, nor every excessive use of force therein, nor every disregard of particular instructions will be such an interruption of the course of employment as to determine or suspend responsibility.' " If this Court could, as it did, hold that the Burns Detective Agency was subject to damages for what Smith did, even though Smith "abused his authority," "was reckless" and "inflicted unnecessary injury," by what process of reasoning does it hold in the case at bar that the Owl Taxicab Company is not responsible for the "overzealous" and "reckless" act of Joshua Allen.

In the *Orr* case the Detective Agency argued that Smith may have shot the plaintiff out of pure malice or that he might even have been "afflicted with temporary derangement." Mr. Justice STERN replied to that argument: "But if, instead of such hypotheses based on the dissection of what was really a unitary occurrence, the event is interpreted realistically and as a connected whole, the jury might also, and it would seem more reasonably, have drawn the inference,—and were therefore properly permitted by the court so to do—that the assault by Smith was committed not on his own account but to carry out the function which he was there to perform; that he was acting as a guard. . ."

Mr. Justice STERN said further in the *Orr* case: "There is *nothing in the testimony to indicate that, in shooting plaintiff and Haiman, Smith had a purpose dissociated from that of his employment,* or that he was engaging in what, by one of the drolleries of the law, is termed a 'frolic' of his own."

How does the *Orr* case differ from the one at bar? There is no evidence whatsoever to show that Allen had any purpose dissociated from his employment in shooting DiLembo. There is nothing to show that Allen was on a "frolic" of his own. The evidence indicates

that rival union men were at the point where he stopped and he could well have believed that they intended to attack him. He could well have assumed that this was the "show-down" of which his employer warned him about.

This Court has frequently quoted with approval, and it particularly did so in the *Orr* case, the authoritative, logical and just expression of the law on this subject as laid down in the case of *Rounds v. Delaware, Lackawanna & Western R. R. Co.,* 64 N. Y. 129, as follows: "It is in general sufficient to make the master responsible, that he gave to the servant an authority, or made it his duty, to act in respect to the business in which he was engaged when the wrong was committed, and that the act complained of was done in the course of his employment. The master in that case will be deemed to have consented to and authorized the act of the servant, and he will not be executed from liability, although the servant abused his authority, or was reckless in the performance of his duty, or inflicted an unnecessary injury in executing his master's orders. *The master who puts the servant in a place of trust or responsibility, and commits to him the management of his business or the care of his property, is justly held responsible when the 'servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury upon another."*

It may be in the present case that Allen, in shooting DiLembo, used bad judgment, he may have lacked in discretion, he may have had an infirmity of temper, he may have been under the influence of passion aroused by the circumstances and the occasion, and he may have gone beyond the strict line of his duty or

authority, but it is *just that kind of a case* that a jury must pass upon, as pointed out in the above quotation which this Court has so many times affirmed.

Although the Majority made no specific reference to the classic utterance in the *Rounds* case, except insofar as it indirectly approved it through the reference to the *Orr* case, it perhaps meant to distinguish it by saying that the act committed by the servant may be "so outrageous or whimsical" as to take it out of the reach of the law. Who decides whether it is outrageous or whimsical? Is this not a question for the jury? And if the act of Allen was outrageous, were not the exhortations to violence on the part of his employer even more outrageous?

The Majority says that the case of *Howard v. Zaney Bar*, 369 Pa. 155, which it cites, "presented a much stronger case for the plaintiff than those in the present action." I don't think so. In the *Howard* case there was no evidence that the owner of the Zaney Bar instructed the bartender to use violence toward those who entered his barroom. In the case at bar, the official of the taxicab company not only exhorted violence but handed out weapons.

The Majority assumes that it strengthens its position by stating that Joshua Allen was not acting justifiably in self-defense. It would seem to me that this fact indicates all the more the liability of the employer. If Allen had been acquitted on the grounds of self-defense, that would of course establish that DiLembo had been the aggressor and, of course, the defendant taxicab company could not then be held liable on any score. It is because Allen was an aggressor, following the exhortation of his employer, that liability here is established.

Entering a nonsuit is serious business. It deprives an aggrieved party of the opportunity to present his

case before a jury for its determination. Of course, there are cases where the litigant is not entitled to a decision by a jury, but it must be a clear case,—a very clear case. In *Virgilio v. Walker & Brehm,* 254 Pa. 241, 244-45, this Court said: "In a case of this character [trespass for damages for personal injury], a nonsuit can be entered only when it is inconceivable, on any reasonable hypothesis, that a mind desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law, after viewing the evidence in the light most advantageous to the plaintiff, could determine in his favor the controlling issues involved." I cannot bring myself to say after reviewing the evidence that it is inconceivable, on any reasonable hypothesis, that the plaintiff had no case to submit to the jury. I believe that the evidence shows that a jury could well have found that Louis DiLembo might still be alive (barring other accidents, of course), had it not been for Silas Knox's exhorting Joshua Allen into his criminal and outrageous act.

There is still another and compelling reason why the nonsuit should be lifted. The Act of March 11, 1875, P. L. 6, §1, provides, inter alia: "Whenever the defendant upon the trial of a cause in any court of common pleas of this commonwealth shall offer no evidence, it shall be lawful for the judge presiding at the trial to order a judgment of nonsuit to be entered if, in his opinion, the plaintiff shall have given no such evidence as in law is sufficient to maintain the action . . ." The defendants here *did* offer evidence. In *Jordan v. Sun Life Assur. Co. of Canada,* 366 Pa. 495, we said: "The granting of a nonsuit after defendant has introduced evidence is a clear violation of the Act of March 11, 1875, P. L. 6, §1 and cannot be condoned." In *Liebendofer v. Wilson,* 175 Pa. Superior Ct. 632,

the Superior Court said: "The entry of the nonsuit in the case of Ruth Liebendofer v. George V. Wilson was clearly in error. A nonsuit may not be entered after the defendant has introduced evidence."

For all these cogent reasons, I would reverse the judgment and order a venire facias de novo.