Marjorie BATES, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Juanita Ann DECKARD, et
al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 78–3205–CV–S,
78–3212–CV–S.

United States District Court,
W. D. Missouri, S. D.

July 20, 1981.

William H. Sanders, Karl Zobrist, Kansas City, Mo., for plaintiff Marjorie Bates.

David E. Wilhite, Lebanon, Mo., for plaintiff Juanita Ann Deckard.

James L. Hutton, Jr., Rolla, Mo., and J. Max Price, Salem, Mo., for plaintiffs Leroy A. Bates and Mr. & Mrs. James Hawkins.

Darrell Deputy, Jr., Lebanon, Mo., for plaintiffs Mr. & Mrs. Hershel Needham.

Kenneth Josephson, Asst. U. S. Atty., Kansas City, Mo., for defendant.

## MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

COLLINSON, Senior District Judge.

### I. STATEMENT OF THE CASE

This is a civil action arising out of the January 13, 1977, murder of three teenagers and the attempted murder of a fourth teenager by a military policeman on the Fort Leonard Wood, Missouri, military base. The military policeman, Specialist 4 Johnny Lee Thornton, was later convicted of kidnap, rape, assault with intent to kill, and murder. Plaintiffs are Juanita Ann Deckard, the only survivor of the incident and the parents of deceased victims Anthony Lee Bates, Wesley Hawkins, and Linda Needham.

All plaintiffs allege that the United States is liable for Thornton's tortious conduct under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, et seq., because he was a "law enforcement officer" within the meaning of the 28 U.S.C. § 2680(h) proviso allowing the United States to be sued for intentional torts committed by its law enforcement officers acting within the scope of their employment (hereinafter referred to as Count I). In addition, plaintiff Bates alleges the United States was negligent in entrusting Thornton with certain instrumentalities of the crime and is therefore liable under the general provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq. (hereinafter referred to as Count II). This case, originally brought as two separate actions, was consolidated on September 19, 1980, but despite the consolidation the other plaintiffs have chosen not to join with Bates in Count II.

The parties have entered into stipulations of facts and based upon these stipulations, the parties have made cross motions for summary judgment on the issue of liability. All parties have stated that they do not desire to put on any additional evidence or

have a plenary evidentiary hearing of any kind and have requested the Court to decide the issue of liability on the basis of the stipulated facts.[1]

After review of the record, the Court determined that the parties' stipulations of facts were sufficient to enable the Court to rule on the parties' motions for summary judgment on Count I. The Court did not feel, however, that it had before it a sufficient factual basis to render a decision on the motions for summary judgment on Count II. Accordingly, this Court ordered the parties to file additional narrative statements and reopened discovery for Count II of the Bates' case. Submission of the narrative statements for Count II is pending. The discussion set out below therefore, applies only to the parties' motions for summary judgment on Count I.

## II. FACTS

The stipulations of facts state that on January 12–13, 1977, Johnny Lee Thornton was a Specialist 4 in the 463rd Military Police Company, stationed at Fort Leonard Wood, Missouri. At all relevant times on January 12–13, 1977, Thornton was on active duty as a member of the United States Army and as an employee of the Department of the Army, an agency of defendant United States of America. Thornton was a military policeman assigned to the Game Warden Section of the Provost Marshal Office at Fort Leonard Wood, Missouri. All the facts which form the basis of the present action occurred on the Fort Leonard Wood Military Reservation in Pulaski County, Missouri.

Thornton's duties consisted of the random and selected patrolling of Fort Leonard Wood. Thornton checked permits, assisted sportsmen, and patrolled for fish and game violators, poachers, and trespassers. He was also to search for illegal trash dumping; the destruction, dumping or cutting of trees; and the destruction of wildlife food plots.

Thornton's work involved a minimal amount of supervision and a high degree of professional competence. In addition to his game and wildlife duties set out above Thornton also had authority to arrest military personnel and to detain civilians for any suspected crimes and could make such arrests or detention on any and all parts of the Army base. It was Army policy that the detention of civilians for suspected crimes be limited to only such time necessary to release a civilian to federal or state law enforcement officials.

On the evening of January 12, 1977, Thornton reported for duty and was issued several items of United States Army equipment by agents of defendant United States. He was issued a four-wheel drive military police jeep which was utilized by Thornton while he was on duty on January 12–13, 1977. The vehicle was clearly marked as a military police vehicle and Thornton was in full military uniform at all times during this period.

Thornton was also issued several other items of United States Army equipment by agents of defendant United States. He was given one U. S. Army 45-calibre pistol, several rounds of ammunition, two pairs of military police handcuffs and one military police badge. It was not unusual for someone acting in Thornton's capacity to check out two pairs of handcuffs or several rounds of ammunition before going on duty.

While on duty on the evening of January 12–13, 1977, Thornton stopped a vehicle by using his red emergency lights on his military police jeep. The vehicle was driven by Anthony Lee Bates and occupied by passengers Wesley Hawkins, Juanita Ann Deckard, and Linda Needham. All the occupants of the car were teenagers who lived in the Fort Leonard Wood area. Thornton informed Bates and Hawkins that the southgate Texaco station, a nearby gas station which is not on United States property, had been robbed and that Bates' car

---

1. See, Stipulations of Fact, Part I, p. 1, March 5, 1980; Standard Pretrial Order No. 2, Part VI, para. 1, p. 2 (July 7, 1980); July 15, 1980, letter from counsel for defendant; Transcript of pretrial conference of November 17, 1980, at p. 21.

matched the description of the car involved in the robbery. While the southgate Texaco station was not, in fact, robbed on January 12–13, 1977, it is agreed that if the southgate Texaco station had been robbed, as Thornton alleged, he would have had the authority to stop and detain suspected vehicles on the military base while he was on duty.

After stopping the vehicle, Thornton ordered the two males, Bates and Hawkins, to get out of the car. He handcuffed Bates and Hawkins' hands behind their backs and placed the two youths in the back seat of the military police jeep. Then, without provocation, Thornton shot Anthony Lee Bates and Wesley Hawkins through the chest with his military issue 45-calibre pistol as they sat handcuffed in the back seat of the jeep.

After shooting Bates and Hawkins, Thornton ordered Juanita Ann Deckard and Linda Needham into the jeep and took them to a cabin on a remote part of the Army base. He then forcibly raped the girls and forced them to commit oral sodomy upon each other and to commit oral sodomy upon him. Afterwards, Thornton shot the two girls. He then buried all four victims in the snow and left them for dead. Anthony Lee Bates, Wesley Hawkins, and Linda Needham died as a result of the gunshot wounds inflicted by Thornton. Juanita Ann Deckard was the only survivor of Thornton's attack. On July 26, 1977, in criminal proceedings before this Court[2] Thornton was convicted of murder in the first degree, assault with intent to kill, rape, and kidnapping for the purpose of committing rape.

2. The Court notes that while the parties' stipulations of fact form the only basis for this Court's present ruling, the Court, having presided over the criminal trial, is thoroughly familiar with the facts involved in this action.

3. Title 28 U.S.C. § 1346(b) states in pertinent part:
... The district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, for personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope and course of employment,

## III.  DISCUSSION

### A.  Applicable Statutes.

Plaintiffs bring this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)[3] and 2671 et seq.[4] For purposes of 28 U.S.C. §§ 1346(b) and 2671 et seq., the scope of employment is determined by state law. Stencel Aero Engineering v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977); Bissell v. McElligott, 248 F.Supp. 219 (D.C.Mo.1965) aff'd 369 F.2d 115 (8th Cir. 1966), cert. denied, 387 U.S. 917, 87 S.Ct. 2029, 18 L.Ed.2d 969 (1967). "Acting within the scope of his office or employment" means acting in the line of duty in the case of a member of the military, 28 U.S.C. § 2671, and "the words 'line of duty' in [28 U.S.C. § 2671] go no further than to invoke the state law of respondeat superior with respect to tort claims arising out of alleged wrongful acts of military personnel." Bissell v. McElligott, supra, 369 F.2d, at 117. Thus, under these sections, the United States can be liable for the torts of an employee of the government acting within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act or omission occurred.

Prior to 1974, 28 U.S.C. § 2680 unqualifiedly excluded certain claims from the Act, such as

 any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution abuse of process, libel,

under circumstances which the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

4. Title 28 U.S.C. § 2674 states in pertinent part:
The United States shall be liable, respecting the provisions of this Title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages....

slander, misrepresentation, deceit, or interference with contract rights.

28 U.S.C. § 2680(h). In 1974, however, a proviso was added to § 2680(h) which

[p]rovided, that with regard to acts or omissions of investigative or law enforcement officers of the United States government, the provisions of this chapter and Section 1346(b) of this Title shall apply to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to exercise searches, to seize evidence, or to make arrests for violation of federal law.

(hereinafter referred to as "proviso"). It is stipulated that on January 12–13, 1977, Thornton possessed the legal power to make arrests for violation of federal law[5] and was therefore a "law enforcement officer" of the United States within the meaning of the 28 U.S.C. § 2680(h) proviso. Accordingly, the single dispositive issue in Count I of the consolidated cases at bar is whether Johnny Lee Thornton's acts were committed "within the scope of his employment" as defined by the Missouri law or *respondeat superior* so as to invoke liability on behalf of defendant United States of America under 28 U.S.C. § 2680(h). In other words, this Court must determine whether the doctrine of *respondeat superior,* as it currently exists in Missouri, can be applied to the acts of Johnny Lee Thornton so as to impose liability on defendant United States.

B. Missouri *Respondeat Superior* Law.

Any discussion of the law of *respondeat superior* in Missouri must necessarily begin with the landmark case of *Haehl v. Wabash R. Co.,* 119 Mo. 325, 24 S.W. 737 (1893). *Haehl* was an action for the wrongful death of a man shot by a bridge watchman employed by the defendant railroad. The decedent was crossing a railroad bridge and, after being halted and turned away by the watchman, he started to leave the bridge and was pursued and shot while still upon the bridge approach. In what has now become an oft cited passage, the court pronounced the Missouri rule of *respondeat superior.*

The principal is responsible, not because the servant has acted in his name or under color of his employment, but because the servant was actually engaged in or about his business, and carrying out his purposes. He is then responsible because the thing complained of, although done through the agency of another, was done by himself; and it matters not in such case whether the injury with which it is sought to charge him is the result of negligence, unskillful or wrongful conduct, for he must choose fit agents for the transaction of his business. But if his business is done, or is taking care of itself, and his servant, not being engaged in it, not concerned about, but impelled by motives that are wholly personal to himself, and simply to gratify his own feeling of resentment, whether provoked or unprovoked, commits an assault upon another, when that has and can have no tendency to promote any purpose in which the principal is interested, and to promote which the servant was employed, then the wrong is the purely personal wrong of the servant, which he, and he alone, is responsible.

*Haehl v. Wabash R. Co.,* 119 Mo. 325, 339, 24 S.W. 737, 740 (1893) *quoted* in *Wellman v. Pacer Oil Company,* 504 S.W.2d 55, 60–61 (Mo.1973) (Morgan, J., dissenting); *Tockstein v. P. J. Hammill Transfer Co.,* 291 S.W.2d 624, 626 (Mo.App.1966); *Bova v. St. Louis Public Service Co.,* 316 S.W.2d 140, 143–144 (Mo.App.1958).

After enunciating the principle set out above, the court held the defendant company liable and stated "it was not necessary, to render the defendant liable, that it should have authorized its watchman to kill the deceased or sanction the deed after it was done; and however wanton or malicious it was, the principal is liable if it is

---

**5.** Stipulation of facts on issue of liability, Part III, para. 11 (March 5, 1980).

done in the course of the servant's employment." *Haehl v. Wabash R. Co., supra,* at 340–341, 24 S.W. at 741.

In 1956 the Missouri Supreme Court in *Tockstein v. P. J. Hammill Transfer Co., supra,* stated that the *respondeat superior* rule from *Haehl* "has been held to be the law of Missouri since 1893." *Tockstein v. P. J. Hammill Transfer Co., supra,* at 626. The court reiterated that under the *Haehl* pronouncement, "before one assaulted by a servant may hold a master liable, there must be proof that the assault was made with the intent to promote or further the master's business." *Id.* Using this test, the court held that the defendant transfer company was not liable for injuries sustained when the company's driver struck plaintiff in the face with his fist because evidence revealed that the driver gave in to his feelings by striking plaintiff after the driver had made his delivery to the store and had become angered with plaintiff.

In so holding, the *Tockstein* Court reviewed several Missouri cases, including *Milazzo v. Kansas City Gas Company,* 180 S.W.2d 1 (Mo.1944) and *State ex rel. Gosselin v. Trimble,* 328 Mo. 760, 41 S.W.2d 801 (1931). *See, Tockstein v. P. J. Hammill Transfer Co., supra* at 627–28. In *Milazzo,* the defendant gas company was held not liable for one of its meter reader's assault upon plaintiff after the meter reader had read the basement meter, returned upstairs to leave plaintiff's store and renewed an argument with plaintiff. In *State ex rel. Gosselin,* defendant cab company was held not liable for the assault of its cab driver upon plaintiff after the cab which plaintiff was driving collided with the cab defendant's employee was driving. In both cases, the Missouri Supreme Court stated that the assault by defendant's employee was not intended to further the master's business and therefore recovery against the master was denied.

In 1965, a result similar to that of *Haehl v. Wabash R. Co., supra,* was reached in

*Panjwani v. Star Service and Petroleum Co.,* 395 S.W.2d 129 (Mo.1965). In *Panjwani,* defendant company's employee struck plaintiff in the face with the nozzle of a gasoline pump hose after plaintiff insisted upon additional service after buying only one dollar's worth of gasoline. The court stated that " 'the overwhelming weight of authority supports the proposition . . . that an employer may be held responsible in tort under the doctrine of *respondeat superior* for an assault committed by his employee and while acting within the scope of the employment, even though the latter acted wantonly, and contrary to the employer's instructions.' " *Id.,* at 130, *quoting* Annot. 34 A.L.R.2d 372, 374 (1954). The court concluded that "plaintiff made a submissible case of a vicious unprovoked assault and battery 'as plaintiff was engaged in trying to settle a controversy concerning a portion of defendant's business, on the premises, during the working hours.' " *Id.,* at 131–132 *quoting Barger v. Green,* 255 S.W.2d 127, 131 (Mo.App.1953).

As illustrated by *Panjwani* and its predecessors, a master can be held liable for the torts of his servant if a servant's tort is committed while acting within the scope of his employment. The test which has been repeatedly used by Missouri courts in determining whether a servant's tortious conduct is within the scope of employment is not whether the servant's act was committed during the term of his employment, but whether it was committed with the intent to further the purposes of the master. *See, Burks v. Leap,* 413 S.W.2d 258 (Mo.1967); *DeMariano v. St. Louis Public Service Co.,* 340 S.W.2d 735 (Mo.1969); *Pyles v. Bos Lines, Inc.,* 427 S.W.2d 790 (Mo.App.1968); *Peak v. W. T. Grant Co.,* 386 S.W.2d 685 (Mo.App.1964); *Abel v. Campbell "66" Express, Inc.,* 378 S.W.2d 269 (Mo.App.1964); *Stone v. Reed,* 247 S.W.2d 325 (Mo.App. 1952); *Miceli v. Williams,* 293 S.W.2d 136 (Mo.App.1965).[6]

---

**6.** In *Miceli v. Williams,* 293 S.W.2d 136 (Mo. App.1956), a case with certain application to the one at bar, the court used the furthering of

the purposes of the agent's master test and stated that if at the time of the tort, the employee has departed from his work to fulfill a

C. The 1974 Proviso To 28 U.S.C. § 2680(h)

■■ The proviso to 28 U.S.C. § 2680(h) waives the defense of sovereign immunity for suits brought against the United States for certain intentional torts committed by its law enforcement officers acting within the scope of their employment. *Solomon v. United States*, 559 F.2d 309 (5th Cir. 1977). Waivers of sovereign immunity are to be strictly construed. *See, e. g. United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941); *Schillinger v. United States*, 155 U.S. 163, 166, 15 S.Ct. 85, 86, 39 L.Ed. 108 (1894). While not dispositive, it is this Court's opinion that the use of Missouri's "furthering the master's purposes" test is consistent with a strict construction of the 1974 proviso and does not enlarge the waiver of sovereign immunity beyond that intended by Congress. In reference to the proviso, the Senate Committee on Government Operations stated:

This amendment . . . grows out of hearings held by the committee on the reorganization plan last spring. During the course of these hearings, several incidents were brought to the committee's attention in which federal narcotics agents engaged in abusive, illegal and unconstitutional "no knock" raids. The committee's amendment is designed to prevent further abuses of the federal "no knock" statute (21 U.S.C. § 879).

The most notorious of these raids occurred on April 29 of this year at Collinsville, Illinois. In separate incidents involving the same justice department agents, "no knock" raids were conducted into two different homes in Collinsville. The agents entered the two houses without warrants in violation of the federal "no knock" statute, kicked in the doors without warning, shouting obscenities, and threatening the occupants with drawn weapons. The terrified inhabitants were only temporarily relieved when the agents left after discovering they had entered the wrong houses.

. . . .

. . . *The effect of this provision is to deprive the federal government of the defense of sovereign immunity in cases in which federal law enforcement agents, acting within the scope of their employment, or under color of federal law, commit any of the following torts* : assault, battery, false imprisonment, false arrest, malicious prosecution, or abuse of process. Thus, as of the day of the enactment of this measure, innocent individuals who are subjected to raids of the type conducted in the Collinsville, Illinois, would have a cause of action against the individual federal agents and the federal government.

This whole matter was brought to the attention of the committee in the context of the Collinsville raids, where the law enforcement abuses involved Fourth Amendment constitutional torts. Therefore, the committee amendment would submit the government to liability whenever its agents act under color of law so as to injure the public through search and seizures that are conducted without warrants or with warrants issued without probable cause. However, the committee's amendment should not be viewed as limited to constitutional tort situations but *would apply to any case in which a federal law enforcement agent committed the tort while acting within the scope of his employment or under color of federal law.*

S.Rep.No.93–588, 93 Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin. News, p. 2789, 2790–91 (emphasis added).

■ As stated above, the use of the "furthering the master's purpose" test is consistent with the proviso's intended scope. The proviso generally covers intentional torts committed by law enforcement officers, but the *specific* evil which Congress sought to remedy was the Collinsville, Illinois, "no-knock" raid-type situation. The

personal purpose not connected with employment, even though he makes use of the employer's automobile and performs an act having in

mind some purpose of the owner, the employer is not liable. Id., at 138.

agents in that incident were clearly attempting to further purposes of their master when they raided Collinsville homes and attempted to intimidate the inhabitants. The agents entered two houses without warnings in violation of the federal "no-knock" statute, kicked in the doors without warning, shouted obscenities and threatened the occupants with drawn weapons, in an effort, and with the intent, to seize evidence in furtherance of their employer's instructions. There is little doubt that the agents involved in the Collinsville raids were acting with the intent to further the purposes of their master. As a result thereof, it appears that the evil which was sought to be remedied by the enactment of the proviso was the commission of intentional torts by law enforcement agents attempting to further the purposes of their master. In light of the fact that waivers of sovereign immunity are to be strictly construed, this Court feels it is important that the Missouri "furthering the master's purposes" rule goes no further than the waiver intended by Congress in enacting the Section 2680(h) proviso.

▪ It is stipulated that Johnny Lee Thornton's duties consisted of the random and selected patrolling of Fort Leonard Wood for game and fish violators, poachers and trespassers. While he did have the authority to detain civilians for suspected crimes, this Court can find no purpose of Thornton's master which was, in fact, or intended to be, furthered by Thornton's outrageous conduct of assaulting, raping, and murdering the teenage victims. Clearly, Thornton's fabrication that the victims' car matched the description of a car involved in a non-existent robbery in order to further his subsequent outrageous conduct indicates that he was actuated, not by an intent to perform his master's business, but by an intent to fulfill some personal purpose, however perverse it may have been. Accordingly, this Court holds that Specialist 4 Johnny Lee Thornton's conduct in assaulting, raping and murdering the teenage victims was not done with an intent to further any purpose of his master and therefore was not done within the scope of his em-

ployment so as to create liability on the part of his employer, defendant United States, under the doctrine of *respondeat superior* as defined by Missouri law.

D. Missouri's Excessive Violence Rule: *Wellman v. Pacer Oil Co.*

While this conclusion is dispositive of Count I, the Court finds in favor of defendant in Count I for an additional reason. Prior to 1973, Missouri courts held a master liable for the intentional torts of his servant committed in the scope and course of employment regardless of the maliciousness or criminality of the servant's conduct. Indeed, after determining that the bridge watchman's act fell within the principle of *respondent superior*, the Court in *Haehl v. Wabash R. Co., supra,* stated that "however wanton or malicious [the watchman's deeds], the principal is liable if it is done in the course of the servant's employment." *Haehl v. Wabash R. Co., supra,* at 340–341, 24 S.W. at 741 (emphasis added). Similarly, in 1965, *Panjwani v. Star Service and Petroleum Co., supra,* reaffirmed the rule enunciated in *Haehl* by stating that a master could be held liable for the torts of his servant "even though the latter acted *wantonly,* and contrary to the [master's] instructions. *Id.* at 130 (emphasis added) *quoting* Annot. 34 A.L.R.2d 372, 374 (1954). In 1973, however, the case of *Wellman v. Pacer Oil Co.,* 504 S.W.2d 55 (Mo. en banc 1973) required that an additional factor be considered when determining whether a servant's intentional tort is within the scope of his employment so as to create liability on behalf of the master under the doctrine of *respondeat superior.* Because of its applicability to the present case, the *Wellman* case merits detailed discussion.

In *Wellman* plaintiff purchased gasoline at a service station operated by defendant Pacer Oil Company. Allen Gamble, employee of defendant, serviced plaintiff's car. Shortly after plaintiff left the station the hood on the car flew up as he was driving down the road. Plaintiff returned to the station and accused Gamble of "messing up" the hood. In the ensuing argument,

Gamble pulled a gun and shot plaintiff. Plaintiff stumbled back to his car and got in the driver's seat. Gamble followed plaintiff, opened the car door and shot plaintiff again, inflicting serious and permanent injuries. Plaintiff subsequently brought suit against Pacer Oil Company and others.

On appeal to the Supreme Court of Missouri, Pacer Oil argued that Gamble's action in shooting plaintiff was not within the scope and course of his employment. The court agreed, but on a theory novel to Missouri. The court held "the actions of Gamble were so outrageous and criminal—so excessively violent as to be totally without reason or responsibility—and hence [were], as a matter of law, not to be within the scope of his employment." *Id.*, at 58.

In the present case, plaintiffs contend that the degree of force is of little or no significance in Missouri in determining whether the employee's acts were within the scope of employment and cite *Haehl v. Wabash R. Co., supra*, in support. *Wellman* however, expressly overrules *Haehl* and *Panjwani* to the extent that those cases disregard factors such as the maliciousness, the extent of violence involved in, and the criminality of, the servant's act. *Wellman v. Pacer Oil, Inc., supra*, at 59–60. *Wellman* adopts the so-called "excessive violence rule" which states that a servant's conduct can be so outrageous, criminal, and excessively violent that, as a matter of law, it falls outside the scope of employment. *See*, Note 39 Mo.L.Rev. 626, 628 (1974) *citing Wellman v. Pacer Oil Co., supra*, at 58. Although novel to Missouri, the excessive violence rule had been adopted by other jurisdictions prior to 1973. *See, Wellman v. Pacer Oil Co., supra*, at 58–59 *citing Strawder v. Harrall*, 251 So.2d 514

(La.App.1971); *Adami v. Dobie*, 440 S.W.2d 330 (Tex.Civ.App.1969); *Lunn v. Boyd*, 403 Pa. 231, 169 A.2d 103 (1961); *Lombardy v. Stees*, 132 Colo. 570, 290 P.2d 1110 (1956); *Potter & Trust Co. v. Knox*, 381 Pa. 202, 113 A.2d 549 (1955); *Howard v. Zaney Bar*, 369 Pa. 155, 85 A.2d 401 (1952); *Martin v. Jones*, 302 Mich. 355, 4 N.W.2d 686 (1942).

In supporting its holding in *Wellman*, the Court relied heavily on certain sections of the *Restatement (Second) of Agency*. For example, the Court adopted Section 235, which states that a servant's act is not within the scope of his employment unless it is done with an *intent* to perform it as a part of or incident to his employment. *Restatement (Second) of Agency*, Section 235 (1958). Comment (c) to this Section states that an act done in an outrageous or abnormal manner is evidence that the servant lacked intent to serve his master.[7] Section 235, Comment (c) is consistent with prior Missouri decisions in which the courts, after examining the servant's conduct in the circumstances of the case in order to ascertain the servant's intent, held as a matter of law that a servant's intentionally tortious act was not done with an *intent* to promote the master's business. *See*, Note 39 Mo.L.Rev. 626, 629 (1974). *See also*, discussion, *supra*, and *Tockstein v. P. J. Hammill Transfer Co., supra; Porter v. Thompson*, 357 Mo. 31, 206 S.W.2d 509 (1947); *Milazzo v. Kansas City Gas Co., supra; State ex rel. Gosselin v. Trimble, supra; Rohrmoser v. Household Finance Corporation*, 231 Mo.App. 1188, 86 S.W.2d 103 (1935).

The *Wellman* Court also adopted Section 231, Comment (a) of the *Restatement (Second) of Agency*.[8] *Wellman v. Pacer Oil*

7. Restatement (Second) of Agency, Section 235, Comment (c) (1958) states in pertinent part:

*Outrageous acts.* The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business. . . . In such cases, the facts may indicate that the servant is merely using the opportunity afforded by the circumstances to do the harm.

8. Restatement (Second) of Agency, Section 231, Comment (a) states in pertinent part:

The fact that the servant intends a crime, especially if the crime is of some magnitude, is considered in determining whether or not the act is within the employment, since the master is not responsible for the acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result.

. . . .

. . . Likewise a gardener using a small stick in an assault upon a trespassing child to

*Co., supra*, at 58. Section 231, Comment (a) states that "the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result." *Restatement (Second) of Agency*, Section 231, Comment (a) (1957). The rationale behind this Section is that if the act is not appropriate or expected, it can be neither authorized nor incidental to an authorized act. *See, Restatement (Second) of Agency*, Sections 228–29, 235, 245 (1958); *See also*, Note 39 Mo.L.Rev. 626, 629, n.27 (1974).

In turn, plaintiffs in the present action rely on Section 245 of the *Restatement (Second) of Agency*, which states that the employer may be liable for assault by his employee if the employment is likely to bring the employee into conflict with others such as employment to guard property.[9] Section 245 was "noted" for the first time by Missouri courts in *Henderson v. Laclede Radio, Inc.*, 506 S.W.2d 434 (Mo.1974) in which a salesman attempting to collect $15.00 account for his employer during non-office hours and upon non-business premises made an unprovoked and powerful attack on plaintiff and delivered a heedless-of-consequences kick to plaintiff's unprotected eye with sufficient force to fracture a bone near plaintiff's eye and destroy part of his eyesight. The court however, did not rely on Section 245, but rather cited *Wellman's* "controlling effect" in holding the salesman's actions not to be within the scope of employment because they were outrageous on the part of the salesman and unforeseeable on the part of the employer to the accomplishment of the authorized result. *Id.* at 436–37. Accordingly, liability

on behalf of the employer was denied. Such is the case here in that Thornton's employment was one which might, and did, bring him into conflict with others, but his actions were so outrageous as to preclude recovery under *Wellman.*

In further support of this argument, plaintiffs cite *Butler v. Circulus, Inc.*, 557 S.W.2d 469 (Mo.App.1977). In *Butler*, parents of a mentally retarded minor sued the operator of a residential institution for exceptional children alleging that defendant failed to supervise its employees permitting them to physically and mentally abuse plaintiffs' daughter, a resident of defendant's institution. The court found that the nature of defendant's business and the employees' duty to maintain discipline at the institution made the employees' *alleged* violent actions of a different kind than the unforeseeable and outrageous conduct which was found not to be within the scope of employment in *Wellman. Id.*, at 476.

The procedural posture of the *Butler* case makes it easily distinguishable from the present case. In *Butler*, the court did not address the merits of plaintiffs' action, but merely held that plaintiffs' petition stated a cause of action and that the trial judge had erred in dismissing the action. The factors to be considered in reviewing the action upon a motion to dismiss for failure to state a claim are quite different from those considered when, as here, reviewing an action on the merits. In reviewing whether a petition states a cause of action, the *Butler* court correctly stated that a Missouri court is "required to give the pleader the benefit of every reasonable and fair intendment in view of the facts alleged. . . . If the facts

---

exclude him from the premises may be found to be acting within the scope of the employment; if, however, the gardener were to shoot the child for the same purpose, it would be difficult to find the act within the scope of employment.

**9.** Restatement (Second) of Agency, Section 245, Comment (c) states:

Whether or not an employment involves or is likely to lead to the use of force against a person of another is a question to be decided upon the facts of the individual case. To create liability for battery for a servant upon

a third person, the employment must be one which is likely to bring the servant into conflict with others. The making of contracts, or the compromise, settlement, or collection of accounts, does not ordinarily have this tendency. On the other hand, the employment of servants to guard or to recapture property, to take possession of land, or to deal with chattels which are in the possession of another, is likely to lead to altercations, and the master may become liable, in spite of instructions that no force shall be exerted against the person of the possessor.

pleaded and reasonable inferences to be drawn therefrom, looked most favorable from the plaintiffs' standpoint, show any ground upon which relief can be granted, the plaintiff has a right to proceed." *Butler v. Circulus, Inc.*, 557 S.W.2d 469, 472 (Mo.App.1977), *quoting Euge v. Golden*, 551 S.W.2d 928, 931 (Mo.App.1977). The method of analysis is quite different when reviewing an action for disposition on its merits, as here, where rather than giving the plaintiff the benefit of every doubt, the plaintiff bears the burden of proving his allegations by a preponderance of the evidence. Accordingly, because of its procedural posture, the *Butler* case is accorded little weight.

Plaintiffs also rely on the recent Missouri Court of Appeals cases of *Wagstaff v. City of Maplewood*, 615 S.W.2d 608 (Mo.App. 1981) and *Mansfield v. Smithie*, 615 S.W.2d 649 (Mo.App.1981). Plaintiffs' reliance upon these cases however, is misplaced because in both cases the employer was held liable *only* after a finding that the employee was acting with an intent to further the business of his employer when he committed the tort. *Wagstaff v. City of Maplewood, supra*, at 610–11; *Mansfield v. Smithie, supra*, at 654. This Court makes no such finding. Furthermore, in *Wagstaff*, there was a finding that the employee's act was negligent rather than intentional. *Wagstaff v. City of Maplewood, supra*, at 610.

■ As previously stated, the excessive violence rule of Section 231 was novel to Missouri and its adoption changed Missouri *respondeat superior* law. *Wellman* is the first Missouri case to hold that a servant's conduct may be so violent that, as a matter of law, no factfinder could reasonably find that the conduct arose naturally from the performance of the servant's work. The Section 231 pronouncement that a master is not responsible for a servant's acts which

are unforeseeable or inappropriate to the accomplishment of the authorized result was seen by the *Wellman* dissenters as injecting a new and additional requirement of foreseeability into Missouri doctrine of *respondeat superior*. *Wellman v. Pacer Oil, supra*, at 60. Analysis of prior Missouri cases, however, reveals that the foreseeability requirement has always been implicit in Missouri *respondeat superior* law. For example, Missouri Approved Jury Instruction, Section 13.02 which is based on well-settled Missouri case law [10] states that a servant's acts are within the scope and course of his employment if (1) they are done by the servant to further the business or interests of the master under the general authority and direction of the master and, (2) they *naturally arose* from the performance of the servant's work (emphasis added). It is suggested, and this Court agrees, that the word "naturally" implies that the servant's conduct must be usual, customary, and expected, which, in essence, creates a requirement for foreseeability. *See*, Note 39 Mo.L. Rev. 626, 630 (1974).

In summary, cases prior to *Wellman* held that the issue of whether the servant's conduct was within the scope of his employment was a factual question, regardless of the maliciousness or criminality of the conduct. *Wellman*, however, appears to hold that in certain situations, the master may not be held liable for his servant's excessive violence even if the servant acted in connection with the employment with the intent to further his master's business. *Wellman* appears to look not at the servant's motivation, but at the servant's conduct and at the result therefrom. If the servant's conduct is "so outrageous and criminal—so excessively violent as to be totally without reason or responsibility—" it is held, as a matter of law, not to be within the scope of his employment. *Wellman v. Pacer Oil, supra*, at 58.[11]

---

**10.** See, Note, 39 Mo.L.Rev. 626, 630 (1974); See also, Missouri Approved Jury Instructions, Section 13.02, Committees Comment (2d ed. 1969).

**11.** Indeed, the *Wellman* court rejected cases dealing with the question of "whether the business of the employer had been completed *before* the assault and that, for that and other reasons, the assault was not inflicted with intent to promote the business of the employer,

Thus, it may be said that one of the facets of the Missouri law of *respondeat superior* is that a servant's conduct may be so outrageous and criminal, so excessively violent, that his conduct, as a matter of law, is not within the scope of his employment. It takes little analysis to conclude that if conduct such as that in *Wellman* was found to be so outrageous and excessively violent so as not to be within the scope of employment as a matter of law, that Johnny Lee Thornton's unprovoked conduct of kidnap, rape, assault, and murder, was also "so outrageous and criminal—so excessively violent as to be totally without reason or responsibility—and hence must be said, as a matter of law, not to be within the scope of his employment."

## IV.  CONCLUSION

In accordance with the foregoing discussion, this Court holds, that based upon the stipulated facts, Johnny Lee Thornton's tortious conduct was not within the scope of his employment, as defined by the Missouri law of *respondeat superior* so as to invoke liability upon his employer, defendant United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.* This Court finds that Thornton's acts were outside the scope of his employment for two reasons, either one of which disposes of Count I in favor of defendant United States of America: First, Johnny Lee Thornton had no intent to further any purpose of his master when he acted; and second, Thornton's acts were so outrageous and excessively violent as to be outside the scope of his employment, as a matter of law under *Wellman v. Pacer Oil, Co., supra.*

This Court is not unmindful or unsympathetic to the innocent plight and emotional suffering of plaintiffs. However, to hold the United States government legally responsible under these circumstances for the barbarous conduct of its employee would not only be contrary to the decisional law of Missouri, but would also expand the waiver of sovereign immunity beyond that contemplated by Congress in enacting the 28 U.S.C. § 2680(h) proviso.  Therefore, in accordance with the foregoing discussion, and in the best interests of justice, it is

ORDERED that defendant United States of America's motion for summary judgment in *Deckard, et al. v. United States of America*, be, and hereby is, granted and that all plaintiff's motions for summary judgment in *Deckard, et al. v. United States of America*, be, and hereby are, denied; and it is further

ORDERED that defendant United States of America's motion for summary judgment in Count I of *Bates v. United States of America*, be, and hereby is, granted and that plaintiff's motion for summary judgment in Count I of *Bates v. United States of America*, be, and hereby is, denied, and it is further

ORDERED that entry of judgment in accordance with this opinion be withheld at this time until final disposition of Count II in *Bates v. United States of America*, at which time a final, appealable judgment will be entered in both cases.

---

but was motivated by purely personal reasons of the employee." *Wellman v. Pacer Oil, Co.,* 504 S.W.2d 55, 57 (Mo. en banc 1973) (emphasis added).  The court refused to further pursue such questions because it "decided that this case should be ruled upon a theory or principle that has not heretofore been expressly applied in this state [(i. e. the excessive violence rule)]." *Id.* at 57–58.