# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Shiretta Justice | : | |
| | : | |
| v. | : | No. 1439 C.D. 2016 |
| | : | Argued: June 9, 2020 |
| Pennsylvania State Police | : | |
| Trooper Lombardo, | : | |
| Appellant | : | |

BEFORE: HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE J. ANDREW CROMPTON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**           **FILED: August 11, 2020**

Appellant Pennsylvania State Police (PSP) Trooper Joseph Lombardo (Trooper Lombardo) appeals from an order of the Court of Common Pleas of Philadelphia County (trial court), dated July 19, 2016. Following a jury trial and the trial court's denial of a post-trial motion filed by Trooper Lombardo, the trial court entered a final judgment in favor of Appellee Shiretta Justice (Ms. Justice) and against Trooper Lombardo in the amount of $160,000. For the reasons that follow, we affirm the trial court's order.

## I.    BACKGROUND

Trooper Lombardo was on duty, in uniform, in a marked PSP vehicle patrolling I-76 near Philadelphia on November 27, 2013. Ms. Justice was driving westbound on I-76 when Trooper Lombardo motioned for her to pull her car over to the side of the highway for a vehicle violation. After learning that Ms. Justice was

driving with a suspended license, Trooper Lombardo requested a tow truck to remove her vehicle from the side of the highway and ultimately impound it.[1] Ms. Justice, after her car was towed away, moved to the side of the highway behind a barrier as she waited for a friend to give her and her stepson a ride home.

When Ms. Justice's transport did not immediately arrive, Trooper Lombardo decided that he would place Ms. Justice and her stepson into his patrol car and drive them to a safe location off the highway. Trooper Lombardo testified that standing on the side of the highway with cars "flying by" was a safety issue, that I-76 was a very dangerous road, and that he wanted to put Ms. Justice and her stepson in his patrol car so he could drive them to a safe location.

Ms. Justice refused to get into Trooper Lombardo's patrol vehicle, so Trooper Lombardo forcibly placed her in handcuffs, twisting her arm behind her back in the process. Ms. Justice started screaming, twisting around, and pleading with Trooper Lombardo. Trooper Lombardo told her to "calm down and stop acting like an animal." (Reproduced Record (R.R.) at 204a.) Approximately one minute later, Trooper Lombardo removed her handcuffs and walked away. Ms. Justice and her stepson then left the scene in her friend's car, which had just arrived.[2]

Soon thereafter, Ms. Justice submitted an administrative complaint to PSP, and PSP's Bureau of Integrity and Special Standards (or Internal Affairs Division (IAD)) conducted an investigation of the incident. Upon completion of the

---

[1] Section 6309.2(a)(1) of the Vehicle Code, 75 Pa. C.S. § 6309.2(a)(1), requires that "[i]f a person operates a motor vehicle . . . on a highway . . . of this Commonwealth while the person's operating privilege is suspended, . . . as verified by an appropriate law enforcement officer . . . , the law enforcement officer shall immobilize the vehicle . . . or, in the interest of public safety, direct that the vehicle be towed."

[2] Ms. Justice's stepson video recorded part of the encounter on his mobile phone, and the video recordings were viewed by the jury and entered into evidence at the trial.

investigation, Captain James Raykovitz (Cpt. Raykovitz), Commanding Officer of PSP Troop K Philadelphia Headquarters, sent Ms. Justice a letter explaining (in relevant part), as follows:

> I have completed my review of Internal Affairs Division (IAD) Personnel Investigation # 2013-0777 which was conducted as a result of the complaint you filed on January 2, 2014. The IAD investigation addressed your allegation of misconduct against a trooper under my command.
>
> After reviewing the investigative report, I also listened to all recorded interviews and viewed all video files associated with this investigation. As a result of this review, I have concluded that there was a breakdown in effective and accurate communication between you and the trooper regarding the arrival of the help you had contacted. The extended response time it took for your acquaintance to get to the scene placed all of you in a more dangerous situation on one of the more dangerous highways in the area. While this led to a more stressful environment, the actions of the trooper did not violate any Department regulations.
>
> The allegation of misconduct you made against the member of the Pennsylvania State Police is[,] therefore, <u>Not Sustained</u>. However, Trooper Lombardo will receive training to ensure that he handles similar incidents in a more succinct fashion.

(R.R. at 116a (emphasis in original).)

Ms. Justice then commenced this case by filing a complaint in the trial court, naming Trooper Lombardo and PSP as defendants. She later amended her complaint to name Trooper Lombardo as the sole defendant and accused him of the following intentional torts: (1) assault; (2) battery; (3) invasion of privacy casting in a false light; (4) intentional infliction of emotional distress; and (5) false arrest, false imprisonment, and abuse of process.

3

Trooper Lombardo filed preliminary objections to the amended complaint, asserting the defense of sovereign immunity. The trial court overruled Trooper Lombardo's preliminary objections. Trooper Lombardo then filed an answer to the amended complaint, asserting that sovereign immunity protected him from liability. At the close of discovery, Trooper Lombardo filed a motion for summary judgment, again asserting the defense of sovereign immunity. The trial court denied his motion for summary judgment without comment or opinion, and the case proceeded to a jury trial in March 2016.

Trooper Lombardo, on the day before the jury trial, filed a bench memorandum of law/demurrer seeking to dismiss the claims against him based on sovereign immunity. The trial court, prior to the jury panel being sworn in, denied Trooper Lombardo's demurrer and determined that the jury trial would proceed. Trooper Lombardo's attorney then informed the trial court and Ms. Justice's attorneys that Cpt. Raykovitz,[3] who wrote a letter to Ms. Justice indicating the outcome of the IAD investigation, could not attend the jury trial because he was on vacation.[4] Trooper Lombardo wanted either to enter Cpt. Raykovitz's letter into evidence or offer testimony that he was "cleared" in the IAD investigation. The trial court informed Trooper Lombardo's attorney that he needed the right witness to

---

[3] At the jury trial, the parties' attorneys referred to "Captain Raykovitz" as "Catherine Raykovitz." (R.R. at 188a, 189a.) Upon completion of the IAD investigation, however, "James Raykovitz" signed the letter that was sent to Ms. Justice informing her of its outcome. For purposes of this appeal, we are considering Cpt. James Raykovitz to be the author of the letter, as well as the person that Trooper Lombardo intended to present as a witness at the jury trial. (R.R. at 165a.)

[4] Trooper Lombardo, in addition to Cpt. James Raykovitz, identified Sergeant James Hennigan (Sgt. Hennigan), who worked in the IAD, as a potential trial witness in his January 2016 settlement memorandum filed with the trial court. (R.R. at 165a.) A potential trial exhibit in that same memorandum is also identified as "Sergeant Hennigan's internal investigation report." (R.R. at 166a.)

4

testify about the letter or that he was "cleared" in the IAD investigation, otherwise it would be considered hearsay and not admitted into evidence. The jury then entered the courtroom, the trial court gave preliminary instructions, the attorneys made their opening arguments, and Ms. Justice commenced her case.

In addition to testifying about the November 27, 2013 incident, Ms. Justice testified that she felt "embarrassed, humiliated, disrespected, victimized, and afraid" when she was handcuffed in front of her stepson. Ms. Justice stated that she was injured during the incident. Her arm was twisted and very sore and her wrists hurt because Trooper Lombardo twisted them in a very awkward position. She also stated that the handcuffs were tight, and she injured her back. When Ms. Justice was asked if she ever hurt her neck or back prior to the incident, she testified that in 2011 she was in an accident on a bus that required a few months of medical treatment. She also stated that prior to the incident she had sporadic neck and back pain, but she was not taking medication for it at the time of the incident.

Ms. Justice sought medical treatment at Eastern Orthopedics Association. She received physical therapy for four to six months and took pain medications for several months. Ms. Justice introduced into evidence the bill from Eastern Orthopedics Association in the amount of $8,933. Ms. Justice's physical therapy and pain in her wrist and arm limited her cosmetology work. Ms. Justice introduced into evidence a chart establishing $9,095 worth of lost income due to missed hairstyling appointments. Ms. Justice also obtained mental health services a few days after the incident because she was anxious, depressed, and not sleeping well. Ms. Justice received treatment from Anita Gordan Bell, Psy. D., who had been her regular therapist for several years prior to the incident. Ms. Justice produced a bill

5

from Dr. Bell in the amount of $1,750 that the trial court admitted into evidence. Ms. Justice rested her case.

Trooper Lombardo then moved for judgment as a matter of law on sovereign immunity grounds. The trial court denied the motion and stated that it was up to the jury to make the factual determination on whether Trooper Lombardo was acting within the scope of his employment when he handcuffed Ms. Justice. Trooper Lombardo commenced his case.

Trooper Lombardo, in addition to testifying about the November 27, 2013 incident, admitted that after the incident he attended additional training on traffic stops. Trooper Lombardo admitted that he completed and submitted a "Live-Stop" form on the day of the incident. On redirect examination, Trooper Lombardo explained that the Live-Stop Program is used exclusively in the City of Philadelphia concerning the towing of cars and the Philadelphia Parking Authority.[5] On re-cross examination, Trooper Lombardo admitted he seized Ms. Justice's vehicle pursuant to the Philadelphia Live-Stop Program. Trooper Lombardo testified that he was not familiar with Philadelphia's Live-Stop policies on whether witnesses have a right to refuse transport in a patrol car.

Trooper Lombardo called PSP Corporal Derek Watford (Cpl. Watford) to testify during the trial. Cpl. Watford was assigned to the PSP Belmont Barracks and was familiar with the rules governing PSP trooper patrols. Cpl. Watford stated that when a car is towed from a limited access highway by a trooper during a traffic stop, the trooper cannot leave the car's occupants on the side of the highway and must

---

[5] "Philadelphia's 'Live Stop' Program 'involves the immediate towing and impoundment of vehicles found to be operating in violation of certain state motor vehicle statutes.'" *Smith v. City of Phila.*, 147 A.3d 25, 27 n.3 (Pa. Cmwlth. 2016) (quoting *Phila. Parking Auth. v. Am. Fed'n of State, Cty., Mun. Employees, Dist. Council 33, Local 1637*, 845 A.2d 245, 246 (Pa. Cmwlth. 2004)).

6

transport them to a place of safety. Cpl. Watford further testified that this was pursuant to PSP's Field Regulations Manual (FRM), Section 7-2, titled "Prisoner Security and Transportation," subsection 2.03, titled "Prisoner and Vehicle Searches," which establishes that anyone transported in a PSP vehicle "shall be searched, patted down for weapons and handcuffed for the safety of the [trooper] as well as the individual being transported." (R.R. at 230a.) The trial court asked if there is a specific regulation that discusses not leaving people on the side of the highway, and Cpl. Watford replied that there was not a specific regulation, but troopers at Belmont Barracks are instructed not to leave people on the side of the highway. Trooper Lombardo concluded his case.

Trooper Lombardo sought a directed verdict based on sovereign immunity. The trial court denied the motion on the basis that whether Trooper Lombardo acted within the scope of his employment when he handcuffed Ms. Justice was a question of fact for the jury to decide. After the attorneys' closing arguments and the trial court's jury instructions, the jury returned a verdict in favor of Ms. Justice on all her claims and awarded her a lump sum of $160,000 in damages.

Trooper Lombardo filed a motion for post-trial relief, seeking judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. Trooper Lombardo argued that the claims against him were barred as a matter of law because of sovereign immunity. Trooper Lombardo claimed that he was entitled to a new trial because: (1) the trial court made improper evidentiary rulings that prevented him from developing his scope of employment argument; (2) the trial court charged the jury incorrectly; and (3) the damages awarded against him were unsupported and grossly excessive. The trial court denied Trooper Lombardo's JNOV motion and

7

refused to grant him a new trial. Trooper Lombardo appealed the decision to this Court.

This Court considered Trooper Lombardo's appeal in *Justice v. Lombardo*, 173 A.3d 1230 (Pa. Cmwlth. 2017) (*Justice I*), *rev'd*, 208 A.3d 1057 (Pa. 2019) (*Justice II*), wherein Trooper Lombardo argued that he acted within the scope of his employment as a trooper with PSP when he handcuffed Ms. Justice after pulling her over for traffic violations. We reviewed the Commonwealth's sovereign immunity statute and found that as a matter of law "[a] Commonwealth employee (such as a PSP trooper) acting within the scope of his employment or duties is protected from the imposition of liability for intentional tort claims by sovereign immunity." *Justice I*, 173 A.3d at 1238. We concluded that, viewing the evidence in the light most favorable to Ms. Justice, the record demonstrated that Trooper Lombardo was acting within the scope of his employment, and the trial court committed an error of law in denying his JNOV motion. We reversed the trial court's decision to deny Trooper Lombardo's motion for JNOV, and we remanded the case to the trial court with instructions to enter judgment in favor of Trooper Lombardo. *Id*. at 1240. Ms. Justice appealed our decision to the Pennsylvania Supreme Court.

On appeal, the Pennsylvania Supreme Court stated that whether the trooper was acting within the scope of his employment was a question for the jury, and because the jury's determination was reasonably inferable from the facts, we erred in disturbing the trial court's verdict. The Supreme Court concluded that, viewing the evidence in the light most favorable to Ms. Justice as the verdict winner, sufficient competent evidence existed upon which the jury could have found that Trooper Lombardo acted outside the scope of his employment. *Justice II*, 208 A.3d at 1057. The Supreme Court, therefore, reversed our decision and remanded the case

8

to us to decide issues raised by Trooper Lombardo in his initial appeal that we did not address in *Justice I*.

## II.  ISSUES

On remand, Trooper Lombardo argues that the trial court impaired his ability to develop a sovereign immunity defense by precluding him from presenting any evidence about the progress of the IAD investigation into his conduct, including the conclusion that he acted in compliance with PSP regulations.  Trooper Lombardo claims that the trial court committed an error of law and abused its discretion when it denied him a new trial because the trial court's scope-of-employment instruction to the jury was tainted by an illogical, unwarranted, and confusing legal pronouncement.  Trooper Lombardo submits that he is entitled to a new trial on the merits, or in the alternative, solely on damages, because the verdict in favor of Ms. Justice was unsupported by the evidence, and is so excessive that it appears to have been based on prejudice, passion, or another improper factor.

## III.  DISCUSSION

We begin by reviewing the law as it relates to our review of a trial court's denial of a party's motion for a new trial.  "It is a fundamental and longstanding precept that the decision to order a new trial is one that lies within the discretion of the trial court." *Coker v. S.M. Flickinger Co., Inc.*, 625 A.2d 1181, 1184 (Pa. 1993).  "'The grant of a new trial is an effective instrumentality for seeking and achieving justice in those instances where the original trial, because of taint, unfairness[,] or error, produces something other than a just and fair result, which, after all, is the primary goal of all legal proceedings.'" *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1121 (Pa. 2000) (quoting *Dornon v. McCarthy*, 195 A.2d 520, 522 (Pa. 1963)).  A review of a denial of a new trial requires the same analysis as a review of a grant.

9

*Id.* at 1122. An appellate court must follow a two-step analysis for review of a trial court's determination to grant or deny a new trial. *Id.* The appellate court must first examine the trial court's decision to determine if a mistake occurred. *Id.* If a mistake occurred, the appellate court must determine whether the trial court abused its discretion or committed legal error in ruling on the request for a new trial. *Id.* at 1123. "A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion." *Id.* "The moving party must demonstrate that he or she suffered prejudice from the mistake." *Carletti v. Dep't of Trans.,* 190 A.3d 766, 780 (Pa. Cmwlth. 2018), *appeal denied*, 204 A.3d 370 (Pa. 2019). "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Id.*

Not every mistake by a trial court warrants a new trial, and a court will not reverse a decision for harmless error. *Paley v. Trautman*, 177 A. 819, 820 (Pa. 1935). "It is well settled that 'an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record.'" *Cmwlth. v. Allshouse*, 36 A.3d 163, 182 (Pa. 2012) (quoting *Cmwlth. v. Parker*, 919 A.2d 948, 848 (Pa. 2007)), *cert. denied*, 569 U.S. 972 (2013). "The doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that '[a] defendant is entitled to a fair trial but not a perfect one.'" *Cmwlth. v. Thornton*, 431 A.2d 248, 251 (Pa. 1981) (quoting *Lutwak v. U.S.*, 344 U.S. 604, 619 (1953)).

## A. Sovereign Immunity Defense

With this framework in mind, we must first review Trooper Lombardo's sovereign immunity defense as it relates to the trial court's alleged errors in this case. Pennsylvania law affords sovereign immunity to "[t]he Commonwealth, and its officials and employees acting within the scope of their duties." 1 Pa. C.S. § 2310. Pursuant to Section 8521 of the Judicial Code, 42 Pa. C.S. § 8521, "[a]n employee of the Commonwealth (such as [a PSP trooper]), *acting within the scope of his employment or duties*, is protected from the imposition of liability for intentional tort claims by sovereign immunity." *Holt v. Nw. Pa. Training P'ship Consortium, Inc.*, 694 A.2d 1134, 1140 (Pa. Cmwlth. 1997) (emphasis added). Further, "willful misconduct does not vitiate a Commonwealth employee's immunity because sovereign immunity protects a Commonwealth employee *acting within the scope of his or her employment* from liability, even for intentional acts which cause emotional distress." *Holt*, 694 A.2d at 1140 (emphasis added). Whether a person acted within the scope of employment is ordinarily a question for the jury. *Orr v. William J. Burns Int'l Detective Agency*, 12 A.2d 25, 27 (Pa. 1940).

Trooper Lombardo argues that "[o]ne lesson to be drawn from the Supreme Court's decision in [*Justice II*] is that determining whether a person's actions were indeed within the scope of employment (for sovereign immunity purposes or otherwise) can be quite complicated." (Appellant's Supplemental Reply Brief at 2.) Trooper Lombardo submits:

> If an employer has independently concluded (especially pre-litigation) that an employee's conduct was acceptable, that suggests that the conduct in question, by the employee, was within the scope of employment. This is why Trooper Lombardo wanted to elicit evidence regarding [PSP's] disposition of Ms. Justice's complaint against him, finding in his favor. The trial court's refusal

11

> to allow him to do so—when cross-examining Ms. Justice, or when testifying himself, or both—was erroneous. That error . . . must be rectified through the grant of Trooper Lombardo's new trial request.

(*Id*. at 3 (footnotes omitted)). Trooper Lombardo also contends that the jury was left with the false impression that PSP neglected to complete an investigation on Ms. Justice's complaint or inform her of the result of the investigation. (Appellant's Brief at 28.) While Ms. Justice explicitly recognizes that Trooper Lombardo's "purpose" in bringing up the IAD investigation was to clarify his immunity defense, she also argues that any investigation-related testimony elicited by the defense would have amounted to inadmissible hearsay. (Appellee's Brief at 12, 13.) The trial court agreed with Ms. Justice's argument. (Trial Ct. Op. at 8-10.)

### 1. PSP Investigation Letter

In determining whether the trial court's evidentiary decisions were "mistakes" that affected Trooper Lombardo's ability to develop his sovereign immunity defense, we begin with the admissibility of Cpt. Raykovitz's letter to Ms. Justice about the IAD investigation. Trooper Lombardo's attorney, during the cross-examination of Ms. Justice, attempted to have her authenticate the letter she received from Cpt. Raykovitz concerning the outcome of her complaint to the IAD. (R.R. at 208a.) Without allowing Ms. Justice to authenticate the letter, the trial court ruled that the letter was hearsay. (*Id.* at 209a.) "'Hearsay' means a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove truth of the matter asserted in the statement." Pa. R.E. 801(c). "'Statement' means a person's oral assertion, written assertion, or nonverbal conduct if the person intended it as an assertion." Pa. R.E. 801(a). "'Declarant' means the person who made the statement." Pa. R.E. 801(b). Generally, hearsay is not admissible except as provided under

12

the Pennsylvania Rules of Evidence, by other rules prescribed by the Pennsylvania Supreme Court, or by statute. Pa. R.E. 802. There are numerous exceptions to the hearsay rule set forth in Pa. R.E. 803, but, for purposes of our decision in this case, we focus on whether the situations at issue meet the hearsay definition.

Cpt. Raykovitz, as stated in his letter to Ms. Justice, reviewed the IAD investigation, listened to all recorded interviews, and viewed all the video files associated with the investigation. After his review, Cpt. Raykovitz concluded that: (1) there was a breakdown in effective and accurate communication between Trooper Lombardo and Ms. Justice regarding the arrival time of Ms. Justice's acquaintance to give her a ride; (2) the extended response time placed Ms. Justice, her stepson, and Trooper Lombardo in a more dangerous situation on an already dangerous highway; (3) Trooper Lombardo's actions did not violate any PSP regulations; and (4) while not sustaining Ms. Justice's complaint allegations, Trooper Lombardo would receive training to ensure that he handles similar incidents in a more succinct fashion. (R.R. at 116a.) In this case, had Cpt. Raykovitz not been on vacation the day of the jury trial, he would have testified about the IAD investigation and how he reached his conclusions without the need for the letter to be entered into evidence.[6]

---

[6] We agree with the trial court that due to the absence of Cpt. Raykovitz at the jury trial, if Trooper Lombardo's attorney wanted to provide the jury with information about Cpt. Raykovitz's investigation, he could have called another person to testify at trial who had direct knowledge and was involved with the investigation. (Trial Ct. Op. at 9.) Interestingly, Trooper Lombardo listed Sgt. Hennigan as a potential trial witness in his January 2016 settlement memorandum filed with the trial court, and Sgt. Hennigan appears to have been directly involved in the IAD investigation. (R.R. at 165a, 166a.) While we can only speculate why Sgt. Hennigan did not testify at the trial, we note that Trooper Lombardo's attorney neither requested that the trial court postpone the jury trial until Cpt. Raykovitz or Sgt. Hennigan became available to testify, nor did he procure a subpoena for Cpt. Raykovitz to testify notwithstanding his vacation.

13

Throughout the jury trial, Trooper Lombardo's attorney attempted various methods to get the results of the IAD investigation and Cpt. Raykovitz's conclusions into evidence. In this instance, the trial court properly concluded that Cpt. Raykovitz's letter was hearsay. The declarant, Cpt. Raykovitz, who did not testify at the jury trial, made statements in his letter to Ms. Justice that her complaint against Trooper Lombardo was not sustained, and Trooper Lombardo attempted to offer into evidence at trial those out-of-court statements to prove the truth of the statements. We conclude, therefore, that the trial court did not err by refusing to allow Cpt. Raykovitz's letter into evidence, because the statements therein constituted inadmissible hearsay.

### 2. *Ms. Justice's Testimony*

Next, we review the trial court's ruling as it relates to Ms. Justice's testimony involving the conclusions of the IAD investigation of her complaint. Ms. Justice testified on direct examination that the day after the incident she filed a complaint with PSP. (R.R. at 207a.) On cross-examination, Ms. Justice admitted that she was interviewed by an IAD officer, that he asked her about the entire incident, and that he watched the videos of the incident in her presence. (R.R. at 208a.) When Trooper Lombardo's attorney asked Ms. Justice if she knew the outcome of her PSP complaint, Ms. Justice's attorney objected to the potential answer as hearsay. (*Id.* at 208a, 209a.) The trial court sustained the objection. (*Id.* at 209a.) Trooper Lombardo argues that the trial court erred in sustaining Ms. Justice's hearsay objection and directs our attention to three Pennsylvania Supreme Court cases to support his argument that Ms. Justice's response to the question would not constitute hearsay.

14

Trooper Lombardo first directs our attention to *Commonwealth v. Sampson*, 311 A.2d 624 (Pa. 1973), wherein the appellant was found guilty of burglary, murder, and aggravated robbery of the decedent who was found lying on the floor behind the counter of his grocery store suffering from numerous fatal knife wounds. *Sampson*, 311 A.2d at 625. The appellant signed a statement which was admitted into evidence at trial that described the incident of decedent's death, alleging that a friend named Mingo also participated in the crimes. At the jury trial, a police detective testified on redirect examination, over the objections of the appellant's attorney, that he spoke with Mingo and Mingo denied participating in the crime.

On appeal, the appellant argued that the detective's testimony about what Mingo said to him was hearsay. The Pennsylvania Supreme Court disagreed and held that "[t]estimony as to an out-of-court statement is not hearsay if offered to prove, not that the content of the statement was true, but that the statement was made." *Id*. at 626. The Supreme Court reasoned that the statements by Mingo that "he was not involved in the killing of the decedent were offered not for their truthfulness, but to show that the statements were made, thus explaining, in part, why the police did not arrest and charge 'Mingo.'" *Id*.

Trooper Lombardo next directs the Court's attention to *Harmon v. Mifflin County School District*, 713 A.2d 620 (Pa. 1998), wherein the school district terminated Harmon's employment based on improper conduct when he provided money for marijuana to another district employee named Wagner. Harmon challenged the termination decision. At his hearing, it was revealed that the district superintendent's inquiry into the matter was prompted by his receipt of a copy of a PSP criminal complaint and arrest warrant filed against district employee Wagner, charging him "with conspiring with several individuals to possess and deliver

15

marijuana." *Harmon*, 713 A.2d at 621. The criminal complaint included the name of another district employee, Osborne. The superintendent testified at Harmon's administrative hearing that when he confronted Wagner the day after his arrest, he freely admitted the allegations were true and ultimately provided the superintendent with Harmon's name as a participant in the crime. Similarly, the superintendent spoke with Osborne, who implicated Harmon as a past purchaser from Wagner and an observed visitor at Wagner's home.

The superintendent testified at the hearing regarding the statements of Wagner and Osborne. Harmon's attorney objected to the superintendent's testimony on hearsay grounds. In response, the district argued that the testimony about the superintendent's interviews with Wagner and Osborne was being offered as background information relevant to the circumstances of the superintendent's confrontations with Harmon and "not for the truth of any out[-]of[-]court statement referenced therein." *Id*. at 622. The Supreme Court agreed with the district and clarified that "[o]ut[-]of[-]court statements may be admitted as background information and their use in this regard is not hearsay. The truth of the statements admitted is immaterial as they are offered for their effect on the hearer to explain his response thereto." *Id*. at 622 n.2 (citing *Sampson,* 311 A.2d at 626).

Trooper Lombardo lastly directs our attention to *Commonwealth v. Jacobs*, 284 A.2d 717 (Pa. 1971), *cert. denied*, 409 U.S. 856 (1972), wherein the appellant, who was found guilty by a jury of first-degree murder and aggravated robbery, appealed his sentence of life imprisonment. During the appellant's jury trial, a witness, who lived within a block of the victim's store, testified that "she saw appellant approximately fifteen minutes before she heard from her father that [the victim] had been shot." *Jacobs*, 284 A.2d at 719. The appellant argued that the

16

witness's statement was hearsay. The Supreme Court disagreed, concluding that "[i]t was not offered to prove the truth asserted by the out-of-court declarant, her father[,] . . . [and] [t]he hearsay rule has no application where the question is whether certain things were said or written by a third person and not whether they are true." *Id.*

The logic of *Sampson*, *Harmon*, and *Jacobs*, persuades us to focus on the purpose of the questions and statements to be elicited—if the goal of the questions is to prove the truth of the matter asserted in the out-of-court statements intended to be elicited, then the questions elicit hearsay testimony. In the present case, Trooper Lombardo argues that he wanted the jury to be aware that the IAD investigated Ms. Justice's complaint and reached a determination about its merits. Ms. Justice, who was testifying at the jury trial, had personal knowledge about the investigation's outcome because she received a letter from Cpt. Raykovitz, informing her that her complaint was not sustained. Trooper Lombardo contends that the purpose of Ms. Justice's in-court statement was to prove that PSP did not ignore her complaint, and in this instance, it was not offered for the purpose of proving that Cpt. Raykovitz's conclusion was correct. He further contends that if Trooper Lombardo's attorney followed-up his question to Ms. Justice with questions seeking to prove that Cpt. Raykovitz was correct in his determination that her complaint was not sustained, then questions would seek to elicit hearsay, but that is not what occurred in this case. Even if we were to agree with Trooper Lombardo that the intent behind the line of questioning was to inform the jury that PSP did not ignore Ms. Justice's complaint, we would still conclude that any mistake on the part of the trial court that may have left the jury with the false impression that PSP

17

neglected to complete an investigation of Ms. Justice's complaint constituted harmless error. Any resulting prejudice to Trooper Lombardo was *de minimis*.

First, although Trooper Lombardo was the subject of the investigation, he had no power to determine how the IAD would conduct the investigation, and there is no evidence in the record that, beyond his involvement in the incident, he influenced the outcome of the investigation. By the time of trial, PSP was no longer a party to the action. Accordingly, even if we assume that the jury inferred from the evidence, or lack thereof, a deficient investigation by the IAD, we are not persuaded that the jury held Trooper Lombardo accountable for that deficiency in evaluating Ms. Justice's claims against him.

Second, when taking into consideration whether the jury got a false impression that PSP neglected to do an investigation, we note that there were many other facts for the jury to reconcile in reaching its verdict on whether Trooper Lombardo acted within the scope of his employment. Among the facts the jury needed to consider were: (1) the reason Trooper Lombardo was stopping Ms. Justice; (2) the demeanor of both parties during their interaction; (3) the sequence of events and conversations leading up to the physical interaction between Trooper Lombardo and Ms. Justice; (4) whether Trooper Lombardo was required to transport or handcuff Ms. Justice; and (5) the amount of force Trooper Lombardo used against Ms. Justice when handcuffing her. Considering the multitude of facts involved in the jury's verdict, whether the jury falsely believed that PSP neglected to investigate Ms. Justice's claims constituted harmless error. We conclude that any potential mistake on the part of the trial court amounted to a harmless error, and its decision to deny Trooper Lombardo a new trial was not an abuse of discretion.

18

### 3. Trooper Lombardo's Testimony

We next review the trial court's evidentiary rulings as they relate to Trooper Lombardo's testimony. On direct examination, Trooper Lombardo's attorney asked Trooper Lombardo whether he learned that Ms. Justice filed a complaint about the incident against him with PSP, to which he replied "yes." (R.R. at 215a.) The attorney also asked Trooper Lombardo if he knew what happened with that complaint and what discipline, if any, resulted from the incident. (*Id.*) Ms. Justice's attorney objected to the questions, and the trial court and attorneys went to sidebar. (*Id.*) The trial court construed the objection to be based on relevance (not hearsay), and the following discussion occurred:

> [Trooper Lombardo's Attorney]: The relevance is that it's showing that he was in compliance with the law. He wasn't disciplined. This isn't a hearsay issue.[7] The prior issue. This is to find out if he was disciplined. I am telling him to speak about a document. He would know.
>
> The Court: What is the relevance? This is a separate hearing with different—what is the standard of proof? What is the cross-examination? Is it an open hearing? Is the complaining person allowed to be present? None of those protections are there and it's just not going to be allowed. It's a different kind of proceeding altogether. You're trying to bolster his credibility by showing is [sic] that within his employee/employer organization, they took no action against him or that they did not find him what? Violation of what? What are the charges? What is the

---

[7] Trooper Lombardo argues, in part, that the trial court improperly excluded the testimony as hearsay. (Appellant's Supplemental Reply Brief at 5.) We agree with Trooper Lombardo that the testimony would not be hearsay, as Trooper Lombardo had first-hand knowledge as to what his employer concluded in the investigation of Ms. Justice's complaint and whether he was subject to discipline. Although the trial court incorrectly referred to the testimony as hearsay, it appears that the trial court also excluded the testimony based on relevancy and potential prejudice. Thus, if the trial court properly excluded the evidence based on relevancy and prejudice, then any error in improperly excluding it based on hearsay would be harmless.

investigation? We don't know all that, and it's hearsay because the investigating officer isn't here. And can you even tell me what was the, quote, finding?

[Trooper Lombardo's Attorney]: Yeah. Unsubstantiated.[8] This is all relevant because it goes to scope of employment. The weight of it you can attack on cross-examination.

. . . .

The Court: I think all we know is that they ended up taking no disciplinary action against him, and I don't think it anticipates any of those other questions. So for all of those reasons, as well as the fact this is an entirely different proceeding with different procedural safeguards, et cetera, I'm not allowing it.

(*Id.* at 216a.) Trooper Lombardo's attorney then asked him if he believed his action complied with policy, to which Ms. Justice's attorney objected, and the trial court sustained the objection. (*Id.* at 216a, 217a.) Because the crux of the trial court's decision relates to the relevance of the IAD's determination that Ms. Justice's complaint was not sustained, we will briefly review what constitutes relevant evidence and when it can be excluded as unfairly prejudicial.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa. R.E. 401. "Whether evidence has a tendency to make a given fact more or less probable is to be determined by the court in the light of reason, experience, scientific principles and other testimony offered in the case."

---

[8] Cpt. Raykovitz's letter stated that Ms. Justice's complaint was "not sustained." Trooper Lombardo's attorney uses the term "unsubstantiated." (R.R. at 140a, 216a.) While the term used does not influence our decision in the case, we will use Cpt. Raykovitz's language of "not sustained" instead of "unsubstantiated" unless we are directly quoting a passage from the trial transcript.

Pa. R.E. 401, Comment. A court, however, "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa. R.E. 403. "'Unfair prejudice' means a tendency to suggest [a] decision on an improper basis or to divert the jury's attention away from its duty in weighing the evidence impartially." Pa. R.E. 403, Comment.

Evidence concerning the outcome of the IAD's investigation and its finding that Ms. Justice's complaint was not sustained is relevant evidence because it bolsters Trooper Lombardo's defense that he did nothing wrong based on his employer's review of the incident. The outcome, therefore, could be of consequence to the jury in determining whether his actions were within the scope of his employment. A trial court, however, is empowered to exclude relevant evidence when the probative value is outweighed by confusing the issues or misleading the jury. *Antonini v. W. Beaver Area Sch. Dist.*, 874 A.2d 679, 687 (Pa. Cmwlth. 2017). In the present case, the trial court's focus in preventing Trooper Lombardo from testifying about the IAD investigation and its conclusion concerned the procedural process the IAD utilized in reaching its determination that Ms. Justice's complaint was not sustained. The trial court had process concerns with the IAD investigation, particularly about the standard of proof and the right to cross-examine witnesses, the "openness" of the IAD's hearing, the right of the complaining party to be present, and the "findings" of the decision maker. The trial court was also concerned that providing the IAD's investigation determination to the jury could divert the jury's attention away from weighing the evidence presented in court as to whether Trooper Lombardo acted within the scope of his employment.

21

The trial court has broad discretion in making evidentiary rulings during trial. *Thomas v. City of Phila.,* 804 A.2d 97, 107 (Pa. Cmwlth. 2002). Neither Cpt. Raykovitz nor any individual involved in conducting the IAD investigation was called to testify, and, consequently, no one could be questioned about the process leading to the IAD's investigation and its conclusion that Ms. Justice's allegations were not sustained. We, therefore, conclude that the trial court did not err or abuse its discretion by refusing to allow evidence of the IAD's investigation and conclusion to be presented through the testimony of Trooper Lombardo.

Trooper Lombardo next argues that the trial court erred in allowing Ms. Justice's attorney to ask him questions about training following the IAD investigation. Specifically, on cross-examination, Ms. Justice's attorney asked Trooper Lombardo if, after the incident, he attended training for how to conduct traffic stops. (R.R. at 223a.) Trooper Lombardo replied that he did have training, and it was called "The First Contact." (*Id*.) Trooper Lombardo's attorney objected *after* the answer, arguing that training of Trooper Lombardo after the incident was an area the trial court previously ruled could not be discussed. (*Id*. at 223a-224a.) Trooper Lombardo's attorney argued that Ms. Justice's attorney's question to him opened the door to allow Trooper Lombardo's attorney to ask questions about it on redirect examination. (*Id*. at 224a.) The trial court previously ruled that the parties could not get into the substance of the discipline or whether Trooper Lombardo was disciplined, and the trial court stated that the question to Trooper Lombardo did "seem to insinuate this was a disciplinary measure of some sort." (*Id*.)

The following exchange occurred between the attorneys and the trial court:

> [Trooper Lombardo's Attorney]: It was the result of the investigation that followed afterwards. So is the door open on this? I need to know so I don't cross that.

22

The Court: It wasn't because he was disciplined but that might have been left questionable to the jury. If [Ms' Justice's attorney] does not do it himself, I will allow you on redirect to say this is a yes or no question. Were you disciplined by your—by [PSP]? Is the reason that you went to the officer training course, whatever it is, because you have been disciplined by the police, by [PSP]? Yes or No.

[Ms. Justice's Attorney]: Well—

The Court: You can address it if you want to clean it up. I think it does insinuate that he was disciplined. That's why he went. Everything else has been kept out, so you can't do smoke and mirrors.

[Ms. Justice's Attorney]: I think, quite frankly, the way that Your Honor laid it out, if anybody has concerns it's [Trooper Lombardo] because I guess the catch phrase here is "discipline." Because what he'll say is "I wasn't disciplined."

The Court: That's why I said it's yes or no.

[Ms. Justice's Attorney]: Okay.

[Trooper Lombardo's Attorney]: It suggests that he wasn't found in violation of policy.

The Court: That's why I said I'll allow you. So that puts you back on the same position you were in before he asked the question, which I think does insinuate that he went as a form of discipline. So anything else?

[Trooper Lombardo's Attorney]: I want to be clear about what his follow-up is going to be allowed to be because then that will determine if I have any more questions.

The Court: What I just said.

[Trooper Lombardo's Attorney]: I understood. I can ask him if the training was disciplinary, if he was going to this course, whatever it is called. Discipline from this incident.

The Court: Yes.

[Trooper Lombardo's Attorney]: And that's a yes or no answer, Trooper. We're not going to have—you're going to let me lead.

The Court: In this case, yes, to control the witness. Absolutely.

[Trooper Lombardo's Attorney]: My objection is still standing to this not being permitted to explore this area further, but I understand what you're saying right now.

(*Id.*) Ms. Justice's attorney did not ask any more questions about Trooper Lombardo's discipline after the incident on cross-examination and re-cross-examination. (*Id.* at 224a, 225a.) Moreover, Trooper Lombardo's attorney, on redirect, did not ask him any questions related to Trooper Lombardo's discipline after the incident. (*Id.* at 225a, 226a.)

Based on the record before us, we conclude that the trial court did not err or abuse its discretion in making its evidentiary ruling concerning this objection. The trial court agreed with Trooper Lombardo's attorney's objection that Ms. Justice's attorney's question of any training Trooper Lombardo took after the incident was an area the trial court previously ruled could not be discussed. To reconcile any damage, the trial court decided that Trooper Lombardo's attorney could ask Trooper Lombardo a "yes" or "no" question on redirect examination: Is the reason that you went to the First Contact training because you had been disciplined by PSP? We note, however, that despite complaining about this alleged error on appeal, Trooper Lombardo's attorney never asked the question the trial court allowed him to ask on

24

redirect examination. Trooper Lombardo's attorney chose not to pursue this line of questioning further.

Trooper Lombardo's final evidentiary argument is that the trial court erred when it allowed Ms. Justice's attorney, over objection, to cross-examine him about the Philadelphia Police Department Citizen Information Bulletin #2, and, as a result, Ms. Justice's attorney "cleverly telegraphed to the jury that a citizen subjected to a Live-Stop is never obligated to submit to being transported away from the highway, no matter what the circumstances." (Appellant's Brief at 28.) Trooper Lombardo argues that while "[t]hat may or may not be true for Live-Stops that occur on local, City of Philadelphia streets, this was not such a situation . . . [and] [to] the contrary, Ms. Justice was stopped on a dangerous, heavily traveled interstate highway, where [PSP] policies and procedures, not local policies and procedures have to be followed." (*Id.*) Trooper Lombardo submits that overall, this left "jurors with the impression that [he] ignored or violated the terms of a *City* bulletin that, on its face, did not apply to him and was unfair and grossly prejudicial." (*Id.* (emphasis in original).)

In reviewing the record, the following exchange occurred:

> [Ms. Justice's Attorney]: Are you familiar with the Live- Stop guideline that says that officers will not transport citizens against their will following a stop? Are you familiar with that guideline?
>
> [Trooper Lombardo's Attorney]: Objection.
>
> The Court: Overruled.
>
> Trooper Lombardo: Is that even a real guideline?
>
> [Ms. Justice's Attorney]: Your Honor, I ask that this be marked as P-5.
>
> The Court: Very well. (P-5 was marked for identification).
>
> The Court Crier: P-5 is being shown to the witness.

25

[Ms. Justice's Attorney]: Do you see the documents that I marked as P-5?

[Trooper Lombardo]: Yes.

. . . .

[Ms. Justice's Attorney]: Does that refresh your recollection as to whether or not citizens have the right to refuse a ride from the highway and the fact that the officers will never transport someone who does not wish?

[Trooper Lombardo's Attorney]: Objection. Foundation.

The Court: Overruled. I guess he can ask him if he is familiar with that. After that, I would sustain it.

[Trooper Lombardo]: Actually, I'm not familiar with— this is a Philadelphia Police Department page. It looks like some kind of bulletin they put on their board, maybe.

[Ms. Justice's Attorney]: Why don't you read what it says at the top of the page?

[Trooper Lombardo]: Philadelphia Police Department.

[Trooper Lombardo's Attorney]: Objection. He can read it to himself.

The Court: Overruled.

[Trooper Lombardo]: It says "Philadelphia Police Department."

[Ms. Justice's Attorney]: It says something else in bold.

[Trooper Lombardo]: Underneath that it says "Citizen Information bulletin number two. Live-Stop program."

[Ms. Justice's Attorney]: All right. Thank you.

(R.R. at 226a-227a.) At the close of Trooper Lombardo's case, the trial court addressed the attorneys regarding the document identified as P-5:

[Trooper Lombardo's Attorney]: Your Honor, at this point, I'm moving the exhibits into evidence and then rest.

The Court: Okay. So those will be admitted into evidence and defense rests. And you had marked an additional exhibit. Did you wish to also move that or no? I think it was P-5 maybe. I think there had been an objection to the foundation.

26

[Trooper Lombardo's Attorney]: There is an objection to that because he didn't know.

The Court: Anything else?

[Ms. Justice's Attorney]: No, Your Honor.

(R.R. at 232a.) There was no further discussion on P-5, and the trial court did not admit the document into evidence. Ms. Justice's attorney made no reference to the document in his closing argument. The only portion of the document that was put before the jury, therefore, are the first two lines of the document that were read into evidence by Trooper Lombardo. (Trial Ct. Op. at 11.) The trial court did not err or abuse its discretion when it allowed Ms. Justice's attorney to ask Trooper Lombardo to identify the document marked P-5 and state whether he was familiar with the Philadelphia Police Department's Live-Stop policy. The trial court is correct that "the underlying evidence in question was fleeting at best, and [Trooper Lombardo] has failed to show how he was prejudiced." (*Id.* at 12.)

### B. Scope of Employment Jury Instruction

We now move to the issue of whether the trial court committed an error of law or abused its discretion concerning the scope of employment charge to the jury when it denied Trooper Lombardo's motion for a new trial. Trooper Lombardo argues that the jury instruction "was confusing and not a fair statement of scope[ ]of[ ]employment law, to the point that including it justifies the granting of a new trial." (Appellant's Brief at 30.) In reviewing Trooper Lombardo's argument, we take into consideration that "when a trial court instructs the jury, the objective is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 335 (Pa. 2014) (quoting *Cmwlth. v. Chambers*, 980 A.2d 35, 49-50 (Pa. 2009)). "Error in a charge is [a] sufficient ground for a new trial if the charge as a whole is

27

inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue." *Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1069 (Pa. 2006) (citation omitted). Overall, the propriety of jury instructions entails a question of law. *Morrison v. Dep't of Pub. Welfare*, *Office of Mental Health (Woodville State Hosp.)*, 646 A.2d 565, 571 n.8 (Pa. 1994).

Trooper Lombardo submitted to the trial court a proposed standard instruction on scope of employment as follows:

> In this case the [sic] Ms. Justice alleges that Trooper Lombardo was outside the scope of his employment in handcuffing [her]. You must consider all of the evidence in this regard and decide whether Trooper Lombardo's actions were in furtherance of [PSP's] interest, activities, affairs or business, or were done solely for the employee's personal benefit and had no connection with the duties of his employment, and were therefore beyond the scope of employment.
>
> "Given the nature of police work, it is reasonably expected that officers conducting a traffic stop may use force in certain circumstances." *Ickes v. Grassmeyer*, [30 F. Supp. 3d 375, 399 (W.D. Pa. 2014)] (citing *Howard v. Zaney Bar*, . . . 85 A.2d 401, 403 ([Pa.] 1952)).

(Appellant's Brief at 29 n.32.) "A trial court need not accept counsel's wording for an instruction, as long as the instruction given correctly reflects the law. . . . Instructions will be upheld if they adequately and accurately reflect the law and are sufficient to guide the jury properly in its deliberations." *Cmwlth. v. Fletcher*, 986 A.2d 759, 802 (Pa. 2009) (quoting *Cmwlth. v. Rainey*, 928 A.2d 215, 242-43 (Pa. 2007)).

The trial court instructed the jury on scope of employment as follows:

> If Trooper Lombardo's actions on November 27, 2013, were within the scope of his employment, then [Ms. Justice] will not recover. It is for you to decide whether Trooper Lombardo at the time of

the occurrence was acting within the scope of his employment. An employee is acting within the scope of his or her employment where such act is in furtherance of the employer's interests, activities, affairs, or business, or is designed to accomplish the purpose of the employment. It is not necessary that the act or omission had not been specifically authorized as long as it could reasonably be found to have been contemplated as part of the employment.

An employee is not acting within the scope of his or her employment when he or she departs or substantially deviates from the business or services of his employer pursuing some personal activity on his own account and not reasonably embraced within his employment or not directed towards advancing his employer's interest.

The conduct of an employee is considered to be within the scope of employment if, one, it is of a kind and nature that the employee is employed to perform. Two, it occurred substantially within the authorized time and space limits. Three, it is actuated, at least in part, by a purpose to serve the employer. And four, if force is intentionally used by the employee against another, the use of force for the particular circumstances is not unexpected by the employer.

(R.R. at 250a-251a.) The trial court then added the following sentence:

An assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by intent to perform the business of an employer[] and[,] as such, is not within the scope of employment.

(*Id.* at 251a.)

Trooper Lombardo claims that the last sentence of the trial court's instructions was not clear, misled the jury, and confused the jury on a material fact concerning the law as to scope of employment. He submits that, "[w]ith that sentence, the court implicitly directed the jury to decide, first, whether an 'assault' occurred and, if so, to then find that the defendant did not act within the scope of employment."

29

(Appellant's Brief at 32.) Trooper Lombardo further argues that, "[i]n essence, the jury was told that a person who commits an assault [(outrageously)] cannot have acted within the scope of employment, by definition," and, "[a]s a matter of agency law, that is simply wrong." (*Id.*) To support his claim that the trial court committed an error of law, Trooper Lombardo directs our attention to three cases where employees acted disobediently, abused their authority, behaved tortuously, or behaved criminally yet remained within the scope of their employment.

In the first case, *Department of Transportation v. Cox*, 476 A.2d 1012 (Pa. Cmwlth. 1984) (*Cox*), a craftsman named Covell occasionally contracted with appellant Cox to do body work at Cox's service station, and they would split the profits on Covell's work. Cox's service station was also an official inspection station regulated by the Department of Transportation (DOT). As part of their business arrangement, Cox permitted Covell to complete Cox's official inspection sheets even though Covell was not authorized to perform inspections. Ultimately, Covell stole an inspection sticker from Cox's files, placed it on his own automobile, and then altered the official inspection sheet to indicate that one of Cox's other customers was issued the stolen inspection sticker. Once the fraud was discovered, DOT suspended Cox's official inspection station certificate for one year. Cox appealed, and the trial court concluded that DOT's suspension order was in error because Covell was not an employee of Cox, and, even if he was, Covell's actions were not within the scope of his employment.

DOT appealed the decision to this Court, arguing that its decision was not based on an employer-employee relationship but instead on the principles of agency law. We disagreed with the trial court and concluded that "[w]hile Covell's acts regarding the sticker were outside of the scope of his authority to make entries on

30

the inspection sheet, his fraudulent entry thereon was not." *Cox*, 476 A.2d at 1014. Further, "'[a] master is normally penalized for the violation of statutory provisions by a servant acting within the scope of his authority even though the agent acted disobediently and the master had no reason to anticipate such misconduct.'" *Id*. (quoting Restatement (Second) of Agency § 217D (Am. Law Inst. 1958)). We concluded that disobedient employees can act within their scope of employment under agency law.

In the second case, *Potter Title & Trust Co. v. Knox*, 113 A.2d 549 (Pa. 1955), a taxi cab driver, while employed and working for defendant, shot and killed a man. The administrator of the dead man's estate brought suit against defendant, and the trial court entered a non-suit. The administrator appealed. The Supreme Court, in determining that the taxi cab driver was not acting within the scope of his employment when he committed his criminal acts, wrote: "It is a general rule of law that when an act is done in the course of one's employment the employer will not ordinarily be excused from liability although the employee abused his authority and thereby inflicted injury upon another." *Potter Title & Tr. Co.*, 113 A.2d at 551. The Supreme Court, however, recognized that there is an important exception to the general principle: "Although an act is a means of accomplishing an authorized result, it may be done in so outrageous or whimsical a manner that it is not within the scope of employment." *Id*. (quoting Restatement (First) of Agency § 229, comment b (Am. Law Inst. 1933)). Accordingly, an act that is outrageous or whimsical may not be within the scope of employment.

In the third case, *First National Bank of Altoona v. Turchetta*, 181 A.2d 285 (Pa. 1962), two brothers (defendants) created a business partnership for the purpose of buying and selling used motor vehicles. The brothers financed partnership sales

of automobiles with banks (including the plaintiff), and it was the custom of the partnership "to secure from the customer in favor of the bank a promissory judgment note secured by a chattel mortgage agreement, authorizing the financing institution to pay a specified amount out of the proceeds to the [brothers]." *First Nat'l Bank*, 181 A.2d at 286. On four different occasions, one of the brothers provided forged signatures of existing persons to the bank in exchange for checks payable to the brothers. When the bank discovered the forgeries, it demanded payment from the partnership to no avail. Default judgment was taken against one brother, while the other brother obtained a jury verdict in his favor. The bank filed for JNOV and sought a new trial, which the trial court denied.

The Supreme Court, in reviewing whether the brother who provided the forged checks made the other brother in the partnership liable for the loss, wrote:

> A principal who puts a servant or other agency in a position which enable[s] the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.
>
> . . . .
>
> The principal is subject to liability . . . although he is entirely innocent, has received no benefit from the transaction, and, as stated in Section 262 [of the Restatement (First) of Agency], although the agent acted solely for his own purposes. Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

*Id*. at 288 (quoting Restatement (First) of Agency § 261 (Am. Law Inst. 1933)). The Supreme Court concluded that the jury verdict for the brother who did not commit

32

the fraud was against the weight of the evidence, overruled the trial court's denial of JNOV, and remanded the case for a new trial.

While it is true that there are situations where employees may be within the scope of employment when they are disobedient, abuse their authority, or behave tortuously or criminally, the three cases submitted by Trooper Lombardo are not dispositive. Rather, when viewed with the remainder of the trial court's jury instructions, the trial court provided the jury with the legal framework to utilize in making factual determinations about Trooper Lombardo's actions and whether those actions fell within the scope of his employment. We discern no mistake in the trial court's jury instruction on scope of employment, which, taken as a whole, is an adequate and clear explanation of the relevant law.

Trooper Lombardo next takes issue with the word "assault" in the scope of employment jury instruction and argues: (1) it does not take much for one person to "assault" another, and (2) under the trial court's own charge, such as it was, an assault is merely an intentional act that puts someone in fear of "harmful or offensive" physical contact. (Appellant's Brief at 32.) In reviewing the record, we note that the trial court, immediately following the sentence Trooper Lombardo argued was improper, provided the following jury instruction:

> An assault is an act done with the intent to put another in reasonable and immediate fear of a harmful or offensive contact with [his or her] body and that does, in fact, cause such fear. To commit an assault it is not necessary that the person actually intend to inflict a harmful or offensive contact with the body of another if it did not put the person intended to cause only a fear of such contact [sic].

> In order for Trooper Lombardo to be held responsible for the commission of an assault against Ms. Justice, you must find, first, that Trooper Lombardo intended to put Ms. Justice in reasonable and immediate

33

fear of a harmful or offensive contact with her body; and, second, that Ms. Justice, as a result of Trooper Lombardo's act, was put in a reasonable and immediate fear of such contact.

(R.R. at 251a.) The Pennsylvania Suggested Standard Civil Jury Instructions, 17.10 defines "assault" as follows:

An assault is an act done with the intent to put another in reasonable and immediate fear of a harmful or offensive contact with his or her body and that does, in fact, cause such fear. To commit an assault, it is not necessary that the person actually intend to inflict a harmful or offensive contact with the body of another. It is enough that the person intend to cause only a fear of such contact. In order for the defendant to be held responsible for the commission of an assault against the plaintiff, you must find: First, that the defendant intended to put the plaintiff in reasonable and immediate fear of a harmful or offensive contact with [his or her] body; and Second, that the plaintiff, as a result of the defendant's act, was put in reasonable and immediate fear of such contact.

The trial court's instruction is nearly verbatim with the suggested standard instruction and succinctly summarizes the law. We do not agree with Trooper Lombardo's argument that the trial court's "elevat[ion of] the relative importance of [Ms. Justice's] assault claim in the manner it did practically commanded the jury to find that Trooper Lombardo did not act within the scope of employment." (Appellant's Brief at 33.) It was a factor that the jury needed to consider in determining whether Trooper Lombardo was acting within his scope of employment. The trial court's statement on assault, therefore, is not inadequate, unclear, misleading, or confusing.

Trooper Lombardo finally contends that the trial court's use of the adjective "outrageous" when describing assaults that are outside the scope of employment did not mitigate the problems that infected this portion of the charge and, if anything,

34

employing such loaded, but undefined, terminology exacerbated the situation. (Appellant's Brief at 33.) The record indicates that the trial court relied on *Costa v. Roxborough Memorial Hospital*, 708 A.2d 490 (Pa. Super.), *appeal denied*, 727 A.2d 1120 (Pa. 1998), in adding the word "outrageous" to the jury instructions when describing assaults.[9] In *Costa*, the plaintiff, a security company's employee, was assaulted by the defendant's employee, a laundry worker at the hospital, after the laundry worker refused to take a drug test. The trial court granted summary judgment to the defendant, and the plaintiff appealed, contending that the hospital was vicariously liable for the abusive actions of its employee.

The Superior Court, after reviewing the Restatement (Second) of Agency, § 228, noted "[t]he determination of whether a person was acting within the scope of his employment is typically a question for the jury." *Costa*, 708 A.2d at 493. "Where, however, the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law." *Id.* (quoting *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1272 (Pa. Super. 1979)). "Moreover, our courts have held that an assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by an intent to perform the business of the employer, and as such, is not within the scope of employment." *Id.*

The trial court's use of the word "outrageous" in describing assaults that are outside the scope of employment is in line with not only *Costa* but also the Supreme Court's decision in *Potter Title & Trust Co.* We conclude, therefore, that the trial court's instructions on assault with the adjective "outrageous" before the word

---

[9] While we do look to Pennsylvania Superior Court decisions for guidance, those decisions are not binding on this Court. *Fisler v. State Sys. of Higher Educ., Ca. Univ. of Pa.*, 78 A.3d 30, 41 n.12 (Pa. Cmwlth. 2013).

"manner" does not constitute an inadequate, unclear, misleading, or confusing jury instruction and correctly reflected the applicable law on this issue.

## C. Damages

We now move to the issue of whether the trial court committed an error of law or abused its discretion concerning the amount of damages the jury awarded to Ms. Justice. Trooper Lombardo questions the jury's $160,000 damages award, arguing it was "unsupported and so blatantly excessive that it must have been based on prejudice or passion, as opposed to relevant admissible evidence." (Appellant's Brief at 34.) Trooper Lombardo submits that the trial record developed by Ms. Justice is sparse to support the amount of her damages and that the trial court's "ensuing instructions to the jury, regarding money damages, were brief and almost entirely generic, spanning less than three transcript pages. (*Id*. at 35, 36.) The trial court did not find the jury's overall award excessive or exorbitant in denying Trooper Lombardo's motion for a new jury trial. (Trial Ct. Op. at 15.)

We begin our review of determining whether the trial court erred in denying Trooper Lombardo a new trial by noting that the "grant or refusal of a new trial because of an excessive or inadequate verdict is a matter for the sound discretion of the trial court and will be sustained by an appellate court in the absence of a clear abuse of discretion or error of law which controlled the verdict or the outcome of the case." *Stokan v. Turnbull*, 389 A.2d 90, 92 (Pa. 1978). "The mere fact that a verdict is large does not necessarily mean it is excessive." *Chin v. New Flyer of Am., Inc.*, 169 A.3d 689, 703 (Pa. Cmwlth. 2017). "The correct question on review is whether the award of damages 'falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake or corruption.'" *Sprague v.*

*Walter*, 656 A.2d 890, 924 (Pa. Super. 1995) (quoting *Haines v. Raven Arms*, 640 A.2d 367, 369 (Pa. 1994)), *appeal denied*, 670 A.2d 142 (Pa. 1996).

Ms. Justice's attorney, during his closing argument, openly suggested that the jury award $160,000 as a lump sum.  (R.R. at 248a.)  Specifically, he stated:

> And then lastly, you're going to be asked to calculate the damages.  As I told you, you'll have her economic damages.  You'll have her medical expenses.  That will come up to around $20,000.  You apply three to that, that gets you to $60,000.  You go back and you look at each one of these items that I've pointed out to you:  Assault, battery, invasion of privacy, intentional infliction of emotional distress and false arrest, and my suggestion to you, it's your decision, you charge him $20,000 for each one of those items.  That gets you to $160,000 as a lump sum . . . .

(*Id*.)  The jury awarded Ms. Justice, as evidenced on the verdict sheet, exactly what the attorney suggested:  $160,000.  (*Id.* at 294a.)

As a preliminary matter, the trial court recognized after the jury trial that it was clearly improper for Ms. Justice's attorney to advocate for a certain sum but also noted that "defense counsel failed to object, thereby waiving this issue." (Trial Ct. Op. at 16.)  Trooper Lombardo's attorney concedes that he did not object to Ms. Justice's attorney's closing argument when Ms. Justice's attorney was advocating for a certain sum of damages.  (Appellant's Brief at 38.)  Accordingly, we consider the challenge to Ms. Justice's attorney advocating for a certain sum of damages in his closing argument waived for purposes of this appeal.

In reviewing whether the jury's award of damages was excessive or exorbitant in this case, we consider the following factors:

> (1) [T]he severity of the injury; (2) whether the injury is demonstrated by objective physical evidence or subjective evidence; (3) the permanency of the injury; (4) the plaintiff's ability to continue employment; (5) the

37

> disparity between the amount of out-of-pocket expenses and the verdict amount; and (6) the damages requested by the plaintiff in the complaint.

*Chin*, 169 A.3d at 703. "Each case is unique and dependent on its own special circumstances[,] and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive." *Whitaker v. Frankford Hosp. of City of Phila.*, 984 A.2d 512, 523 (Pa. Super. 2009).

Regarding the first three "injury" factors, Trooper Lombardo argues that Ms. Justice did not seek medical treatment until a few days after the incident, that she was not hospitalized, and that by her own account "any physical or psychological difficulties she attributes to the incident were not permanent." (Appellant's Brief at 40, 41.) Trooper Lombardo further points out that "her complaints seem to have been mostly if not entirely subjective, and all appear to have been resolved long before trial." (*Id*. at 41.) While we agree with Trooper Lombardo's statements, they are not conclusive of what we may consider.

Ms. Justice testified that her physical injuries consisted of a twisted and very sore arm, wrists that were twisted in a very awkward position, and a back injury due to being pushed and forced into weird positions. She sought medical treatment and received physical therapy for four to six months. She also treated with pain medications for several months. Ms. Justice introduced and the trial court admitted into evidence a bill for medical treatment in the amount of $8,933.

In addition to the medical treatment discussed above, Ms. Justice felt "embarrassed, humiliated, disrespected, victimized, and afraid" when she was handcuffed in front of her stepson. She obtained mental health services a few days after the incident because she was anxious, depressed, and not sleeping well.

Ms. Justice introduced and the trial court admitted into evidence an outstanding bill for mental health services in the amount of $1,750.

Next, we consider that Ms. Justice's ability to continue employment was interrupted due to her physical therapy and pain in her wrist and arm. Trooper Lombardo argues that she only missed a few days of work immediately following the incident, after which, for a time, it was difficult for her to see as many clients as she would normally see, "[b]ut aside from that, she evidentially returned to work as usual." (Appellant's Brief at 41.) Trooper Lombardo argues that there "is no hint of any ongoing employment-related concerns, or losses, after Ms. Justice regained her equilibrium, physically and psychologically." (*Id*.) Here too, Trooper Lombardo's arguments are factually true, but are not the only determinative factors in our analysis of the jury verdict. Ms. Justice did introduce evidence indicating that she lost $9,095 in income due to missed hairstyling appointments, and this supports her argument and the jury's decision to award her damages.

Finally, in considering the remaining factors, we recognize that Ms. Justice's out-of-pocket expenses were $19,778. The jury awarded her $160,000, although she had sought $100,000 in damages in her amended complaint. Trooper Lombardo argues that the disparity between Ms. Justice's out-of-pocket expenses and the amount of the verdict is "striking" as the "verdict was more than eight times the demonstrated economic loss." (*Id*.) Trooper Lombardo submits that the amount demanded in Ms. Justice's original and amended complaints for compensatory and punitive damages was in an amount in excess of $25,000. (*Id*. at 41, 42.) Trooper Lombardo notes:

> While this case was initially filed as a standard civil action with a jury demand, it was transferred by agreement from "Major Jury" to Arbitration about three months later. That means the total amount in controversy was $50,000

or less, *see* Phila. Civ.R. 1301, and at the ensuing arbitration, Ms. Justice was only awarded $15,000. In other words, this was not and was never expected to be a "big" case . . . [noting] [t]here is no denying Trooper Lombardo's appeal from the modest arbitration award, and request for a trial de novo, is what brought the parties to where they are now. In light of the foregoing factors, and the record as a whole, no evidentiary basis for the inflated $160,000 verdict in this case exists.

(*Id.* (citations omitted).) Trooper Lombardo submits that the "trial court's failure even to explain why it did not 'find the jury's overall award . . . excessive or exorbitant' ([Trial Ct. Op.] at 15) was nothing short of an abdication of its responsibility to give due consideration to Trooper Lombardo's post-trial challenge to the inordinately large verdict against him," which constitutes an abuse of discretion warranting a reversal and a remand for further proceedings. (*Id.* at 42, 43.) We disagree.

Viewing the evidence in the light most favorable to Ms. Justice as the verdict winner, we agree with the trial court that the jury's damage award was supported by the evidence. Moreover, it was neither so excessive that it appears to have been based on prejudice, passion, or another improper factor nor was it exorbitant. The jury found that Trooper Lombardo committed the torts of assault, battery, invasion of privacy, and intentional infliction of emotional distress against Ms. Justice. (R.R. at 293a.) In arriving at the damages, the jury was permitted to consider the impact of the incident on Ms. Justice's physical and mental well-being, along with economic damages she sustained in the nature of medical bills and lost wages. (*Id.* at 252a.) Based on the facts of record, we agree with the trial court and conclude that the jury's award of $160,000 in damages to Ms. Justice was not excessive.

## IV. CONCLUSION

Accordingly, we affirm the trial court's order, denying Trooper Lombardo's motion for a new trial.

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Shiretta Justice                         :
                                         :
            v.                           :    No. 1439 C.D. 2016
                                         :
Pennsylvania State Police                :
Trooper Lombardo,                        :
                    Appellant            :

# **O R D E R**

AND NOW, this 11th day of August, 2020, the order of the Court of Common Pleas of Philadelphia County, denying Pennsylvania State Police Trooper Lombardo's motion for a new trial, is AFFIRMED.

 

 

 
_____
P. KEVIN BROBSON, Judge